166 F.3d 308
 The ANDERSONS, INC., an Ohio Corporation,
Plaintiff-Cross/Appellant (96-2353),
Plaintiff-Appellee (96-2287; 97-1010/2133),
v.
HORTON FARMS, INC., a Michigan Corporation,
Defendant-Appellant (96-2287; 97-1010/2133),
Rodney Horton, individually, Defendant-Cross/Appellee (96-2353).
 Nos. 96-2287, 96-2353, 97-1010 and 97-2133.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 5, 1998.
Decided Dec. 17, 1998.
 
 Anthony P.A. Patti (argued and briefed), Angela L. Jackson, Bruce T. Wallace (briefed), Hooper, Hathaway, Price, Beuche & Wallace, Ann Arbor, Michigan, for Appellant.
 Stephen S. Muhich (argued and briefed), David G. Hagens (briefed), Dykema Gossett, Grand Rapids, Michigan, for Appellee.
 James Roland Wierenga (argued and briefed), David & Associates, Grand Rapids, Michigan, for Cross/Appellee.
 Timothy John Smith, Marc L. Fleischaker, Nancy S. Appel, Arent, Fox, Kentner, Plotkin & Kahn, Washington, DC, for Amicus Curiae.
 Before: CONTIE, BATCHELDER, and MOORE, Circuit Judges.
 BATCHELDER, Circuit Judge.
 
 
 1
 Defendant/Appellant Horton Farms, Inc. ("Horton Farms") appeals the district court's decisions compelling it to arbitrate contract disputes with Plaintiff/Appellee/Cross-Appellant The Andersons, Inc. ("The Andersons"), striking its counterclaims, and confirming the eventual arbitration award. The Andersons cross-appeals the district court's order finding that Rodney Horton was not individually liable on the contracts in question and granting summary judgment in his favor. For the reasons that follow, we AFFIRM the district court in all respects.[1]I.
 
 
 2
 Rodney Horton is a Michigan corn farmer and the President of Horton Farms, a Michigan corporation engaged primarily in the business of purchasing, selling, and hauling feed corn. The Andersons is a multi-division/location agri-business firm headquartered in Maumee, Ohio, in the business of originating, merchandising, conditioning, and storing grain and grain products, and other agri-businesses. For more than fifteen years, Horton Farms has done business with and maintained an account with The Andersons;[2] Mr. Horton has never had an individual account with The Andersons.
 
 
 3
 Underlying this dispute are nine grain-delivery contracts. Each contract was negotiated over the telephone, and the parties orally agreed to all of the necessary terms, including price, quantity, commodity, quality, projected date of delivery, and place of delivery. The Andersons followed up these discussions by sending written "Purchase Contract[s] and Confirmation[s]" addressed to Horton Farms, which Mr. Horton signed and returned.
 
 
 4
 Listed on the top of the page of each contract is the name "Horton Farms Inc," followed by Horton Farms' address. Each contract contains the customer number 53945; according to The Andersons' own records, the customer name attached to that customer number is "Horton Farms, Inc." Each contract has a line designated "Seller Signature & Confirmation;" five of the nine contracts are signed by "Rodney Horton, Pres.," while the remaining four are signed by "Rodney Horton." The signature of "Arman Hartung" or no signature at all appears above a line designated "Buyer Signature & Confirmation" on each contract. At the bottom of each contract appears the language, "This is an agreement between RODNEY HORTON and ARMAN HARTUNG."[3] Above that line, there is another statement printed in small type reading: "This is an agreement between SELLER and THE ANDERSONS, an Ohio limited partnership ("Buyer"), by the Andersons Management Corp., its sole general partner. The seller acknowledges confirmation of this purchase by buyer, as noted above, and both parties accept the additional terms on the reverse hereof." In the notes section of Contract No. 16260 is the statement "ROBERT HORTON'S CONTRACT--BUYER IS DAVID AZKOUL"; Contract No. 16261 says "RODNEY HORTON'S CONTRCT [sic]."[4]
 
 
 5
 Attached to each contract is a single page containing two distinct sections: "STANDARD PURCHASE CONTRACT TERMS" and "FLEX/CONVERTIBLE CONTRACT TERMS." A statement on the front page of each contract incorporates these terms. The Standard Terms section includes the following language:
 
 Both parties agree:
 
 6
 a. this transaction is made in accordance with the Grain Trade Rules of the National Grain & Feed Association and the parties will be bound thereby; and
 
 
 7
 b. any disputes or controversies arising out of this contract shall be arbitrated by the National Grain & Feed Association, pursuant to its arbitration rules.
 
 
 8
 Included under the Flex/Convertible Terms are these provisions:
 
 
 9
 The Andersons and Seller warrant that the commodities represented under this contract will be tangibly exchanged. Seller further warrants that the total net position outstanding for delivery shall not at any time exceed the total quantity owned, or expected to be owned, by the Seller.
 
 
 10
 The delivery point may, at a fee to the Seller, be amended only by prior mutual agreement between The Andersons and Seller. The delivery period may be amended only by prior mutual agreement between The Andersons and Seller, and subject to The Anderson's sole discretion.
 
 
 11
 ....
 
 
 12
 At no time will the contract features to the flex/convertible contract be anything other than a pricing mechanism on cash commodity commitments. All futures exchange positions utilized are for hedging purposes of The Andersons only, and not for Seller's account.[5]
 
 
 13
 (emphasis added). Mr. Horton avers that The Andersons never discussed with him either the arbitration clause or the National Grain & Feed Association ["NGFA"] rules.[6] The Andersons do not dispute this.
 
 
 14
 In the last few months of 1995, a dispute over fees arose, and Horton Farms refused to deliver corn to The Andersons.[7] On January 16, 1996, The Andersons canceled all outstanding contracts; they requested the NGFA to arbitrate the dispute and paid the required $1500 fee. Horton Farms refused to sign the arbitration contract or to pay the $1500 fee. The Andersons then filed a complaint in federal court, seeking to compel arbitration of their damages claim against both Horton Farms and Rodney Horton in his individual capacity. Horton Farms responded with a counterclaim against The Andersons alleging breach of contract and seeking recision. After cross-motions and a hearing, the district court granted summary judgment in favor of Mr. Horton in his individual capacity and against Horton Farms and in favor of The Andersons to compel arbitration, and granted the Andersons' motion to strike Horton Farms' counterclaim. Horton Farms appealed (Case No. 96-2287), and The Andersons cross-appealed (Case No. 96-2353).
 
 
 15
 The district court then entered an order granting The Andersons' motion to enforce the judgment and denying Horton Farms's motion to stay arbitration pending the outcome of its appeal, and Horton Farms appealed that order (Case No. 97-1010). A panel of this court subsequently denied Horton Farms' request for a stay of arbitration pending appeal, and on May 28, 1997, the arbitrators awarded damages and attorney fees to The Andersons. After this court denied Horton Farms' request for a stay of enforcement of the arbitration award pending appeal, the district court entered judgment denying Horton Farms' motion for summary judgment vacating the arbitration award, and instead confirming the award in the amount of $271,030.44, with interest of $57.68 per diem until paid and $6,551.26 in attorneys' fees and costs. Horton Farms timely appealed the confirmation order. (Case No. 97-2133). The appeals have been consolidated for our consideration.
 
 II.
 
 16
 We review de novo a district court's grant of summary judgment. Holbrook v. Harman Automotive, Inc., 58 F.3d 222, 225 (6th Cir.1995). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).
 
 
 17
 Although the most important issue for our consideration is discussed in the next section of this opinion, as an initial matter, we agree with the district court that, contrary to the contention of The Andersons, under Michigan law, Rodney Horton did not sign any of the nine contracts in his individual capacity. Cf. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) (courts apply state-law principles that govern the formation of contracts to decide whether parties agreed to arbitrate a matter) (citations omitted). The Andersons' brief summarizes its argument thus: (1) under Michigan law, an officer or agent of a disclosed corporation can incur individual liability on a contract; (2) where any uncertainty exists as to the capacity in which such officer or agent signed the contract, parol evidence is admissible to resolve the ambiguity; (3) because Rodney Horton signed some of the nine contracts at issue using the designation "Pres.," and signed the others without any designation, there is uncertainty as to the capacity in which Horton signed each of the contracts; (4) therefore parol evidence is admissible to demonstrate that Horton signed all of the contracts in his individual capacity. We are not persuaded by this bootstrapping.
 
 
 18
 In Michigan, as in most states, the parol evidence rule is both a rule of evidence and a rule of substantive law. Salzman v. Maldaver, 315 Mich. 403, 24 N.W.2d 161, 165 (Mich.1946). And, as in most states, in Michigan, where the contract is clear and unambiguous on its face, the parol evidence rule operates to preclude the introduction of evidence dehors the contract that would vary or contradict the contract's unambiguous terms. See id.
 
 
 19
 It is true that under Michigan law, the terms of a contract may personally bind an agent even where the agent's principal is disclosed and known to be the beneficiary of the contract. See Landyskowski v. Lark, 108 Mich. 500, 66 N.W. 371, 372 (Mich.1896) (where terms of contract clearly describe the signatories as personally bound, the mere description of the signatories as agents does not trump their clearly-expressed liability). But Michigan also recognizes that "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." Riddle v. Lacey & Jones, 135 Mich.App. 241, 351 N.W.2d 916, 919 (quoting 2 Restatement Agency, 2d, § 320); see also Armstrong v. Andrews, 109 Mich. 537, 67 N.W. 567, 568 (Mich.1896) ("where it clearly appears that the contract is made for and on behalf of a principal, the agent will not be bound").
 
 
 20
 The Andersons attempts to create an ambiguity as to the capacity in which Rodney Horton signed each of these contracts by looking at all of the contracts together.[8] We find no authority for this approach, and, to the contrary, we conclude that each of these contracts must be evaluated independently. We turn first to the contracts signed "Rodney Horton, Pres."
 
 
 21
 There is no question that Mr. Horton signed each of these five contracts in his representative capacity. In addition to the corporate designation, these contracts clearly show other "parentage." See Keidan v. Winegar, 95 Mich. 430, 54 N.W. 901, 901-02 (Mich.1893).[9] Each of the contracts is addressed to Horton Farms, Inc., and lists the Horton Farms' name and customer number on every page; each lists the "Seller" as "Rodney Horton, Pres." "[W]here the paper, on its face, is unmistakably the principal's, parole evidence will not be received ... to charge[ ] the agent." Id. at 901 (quoting Mechum, Ag. § 443). Nothing on the face of any of these five contracts creates any ambiguity.[10] Rather, on its face, each of these contracts unambiguously shows that the parties intended to bind Mr. Horton only in his corporate capacity.[11] Thus, parol evidence is inadmissible, and we decline to disturb the district court's ruling on this matter.
 
 
 22
 We next consider the four contracts signed simply "Rodney Horton." Under Michigan law, "[w]here anything on the face of the paper suggests a doubt as to the party bound, or the character in which any of the signers had acted in affixing his name, testimony may be admitted between the original parties to show the true intent." Armstrong, 67 N.W. at 568 (quoting Mechem, Ag. § 442). Armstrong involved a contract for the construction of a driveway addressed to "Grand Rapids Sidewalk Co.," signed by Plaintiff Armstrong and by "S.F. Andrews," the defendant, without any indication of capacity. Under the signatures was a printed warranty, naming the company as warrantor and including a printed company signature. On the contract margin, there was a subcontract using only the name of the defendant and not the name of the company. Id. at 568. After setting out the above-cited rule, the court held that because some aspects of the contract, such as the defendant's signature without any designation of agency, indicated that the defendant meant to be personally bound, while others, such as the fact that the order was directed to the company, indicated that it was solely the contract of the company, parol evidence should be admitted to show whom the parties intended to bind. Id. at 569. Similarly, in Mok v. Iroquois Building Co., 4 Mich.App. 307, 144 N.W.2d 813 (Mich.Ct.App.1966), the defendants, officers of a corporation, signed promissory notes written on corporate checks; their signatures were underneath the words "Iroquois Building Co," but failed to specify the capacity in which they signed. The court held that under Michigan's negotiable instruments law, the signatures created an ambiguity, and therefore parol evidence was admissible. Id. at 814-15.
 
 
 23
 Applying these cases to the contracts that Mr. Horton signed without designating his corporate capacity, we conclude that parol evidence is admissible to determine Mr. Horton's capacity as a signatory. The Andersons' parol evidence, however, is insufficient to raise a genuine issue of material fact about whether the parties intended to bind Mr. Horton in his individual capacity. In its brief, The Andersons admits that the name on the account for each contract was "Horton Farms, Inc.," and that when negotiating the contracts, Mr. Horton specifically conveyed to Buyer Arman Hartung that he intended to make the contracts under the Horton Farms' account. In addition, as Mr. Horton notes, the Andersons' own internal accounting and other documents list each contract only under the Horton Farms' customer account: every single document relating to these contracts contains the name Horton Farms and most contain its corporate address and/or its customer number. In spite of the fact that in addition to corporate accounts, The Andersons set up individual accounts for individual or non-corporate customers, The Andersons has never maintained an individual account for Rodney Horton. Moreover, The Andersons failed to provide any evidence to counter Mr. Horton's affidavit testimony that he dealt with The Andersons only in his corporate capacity. It is abundantly clear that The Andersons knew that it was dealing with Horton Farms as a corporation and not with Mr. Horton as an individual.
 
 
 24
 The Andersons argues that Arman Hartung testified that it was his understanding that he was contracting with Horton, not Horton Farms. This, however, mischaracterizes the record. At best, Hartung stated that during their telephone negotiations, even though the accounts were specifically under the Horton Farms, Inc., account, at times he would write Horton Farms contracts with the idea that Rodney Horton would be responsible for producing a certain amount of the corn and Robert Horton would produce the remainder. Hartung never tied this contention to any one particular contract, and frequently stated that he does not make a judgment about the form of the entity with which he does business. Even though production might come from separate places, the bottom line is that Mr. Hartung admitted that the contracts were always made with the corporation.[12]
 
 
 25
 As we stated in Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382 (6th Cir.1993),
 
 
 26
 The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.
 
 
 27
 Id. at 1389 (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir.1989)). Here, as the trial court found, "the evidence is overwhelming here that ... the plaintiff was dealing only with the corporation and not with Mr. Horton as an individual." We therefore conclude that the district court properly granted summary judgment in favor of Mr. Horton.
 
 III.
 
 28
 Four of the contracts at issue are styled "Hedge-to-Arrive" ("HTA") contracts; the remaining contracts are either "Fixed Price" or "Basis" contracts. The most important question we must resolve in this case is whether, as contended by Horton Farms, the HTA contracts at issue are covered by the Commodities Exchange Act ("CEA") and thus subject to regulation by the CFTC. If we were to answer this question affirmatively, then the arbitration clause would be unenforceable under CFTC regulations,[13] and the district court would have erred in compelling Horton Farms to arbitrate. However, we do not answer this question in the affirmative. Because we find that the HTA contracts in question require actual, albeit deferred, delivery of corn, we hold that they are cash forward contracts and are therefore excluded from the CEA and CFTC regulation.A.
 
 
 29
 "Futures contracts" are governed by the CEA and concomitantly, subject to CFTC regulations. See 7 U.S.C.A. § 2. Futures contracts are "contracts of sale of a commodity for future delivery." Id.; see also Breyer v. First National Monetary Corp., 548 F.Supp. 955, 962 n. 18 (D.N.J.1982). The term "future delivery," however, explicitly does not include "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C.A. § 1a(11); see also 17 C.F.R. § 1.3(o). Contracts falling under this latter definition are typically referred to as "cash forward" contracts. See CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 577 (9th Cir.1982) (citing H.R.Rep. No. 93-975, 93d Cong., 2d Sess. 129-30 (1974)).
 
 
 30
 The purpose of this "cash forward" exception is to permit those parties who contemplate physical transfer of the commodity to set up contracts that (1) defer shipment but guarantee to sellers that they will have buyers and visa versa, and (2) reduce the risk of price fluctuations, without subjecting the parties to burdensome regulations. See id. at 577-78; Breyer, 548 F.Supp. at 962 n. 18. These contracts are not subject to the CFTC regulations because those regulations are intended to govern only speculative markets; they are not meant to cover contracts wherein the commodity in question has an "inherent value" to the transacting parties. See Co Petro, 680 F.2d at 577-79 (describing history of the cash forward exclusion); Bank Brussels Lambert, S.A. v. Intermetals Corp., 779 F.Supp. 741, 749 (S.D.N.Y.1991). We hold that in determining whether a particular commodities contract falls within the cash forward exception, courts must focus on whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future. See Co Petro, 680 F.2d at 578, 579 ("Most important, both parties to the contracts deal in and contemplate future delivery of the actual grain."); CFTC v. Noble Metals Int'l, Inc., 67 F.3d 766, 769, 772-73 (9th Cir.1995).[14]B.
 
 
 31
 In a Fixed Price contract, at the time of the agreement, the seller and buyer agree on quantity, quality, delivery terms and the price for grain to be delivered at a fixed time in the future. Basis contracts and HTA contracts involve somewhat more flexible price terms, which consist of a "futures reference price" and a "local cash basis level." The Chicago Board of Trade establishes a futures reference price for grain at a specific time in the future, which serves as a national price. The local cash basis level is a local adjustment to the national price and varies from state to state and within a state.
 
 
 32
 In Basis contracts, the seller and buyer agree on quantity, quality, and delivery terms, but initially agree only on the local cash basis price. They agree to agree at a later date (before delivery) on a futures reference price. In HTA contracts, the parties agree initially on the futures reference portion of the price, and agree to agree at a later date on the local cash basis price.[15] According to The Andersons' Manager for Commodity Hedging, the futures reference price is typically the more volatile component of grain prices. Thus, HTA contracts allow sellers to eliminate the major risk of price fluctuation while retaining the flexibility to adjust the price received to local market conditions.
 
 
 33
 Generally speaking, in a basic HTA contract, a farmer and grain elevator enter into a contract that contemplates delivery of a specified quantity of grain at a fixed point in time in the future. To eliminate the risk of change in the futures reference price, the elevator then "hedges" its contract with the farmer by establishing a "short" futures position, i.e., an equal and opposite position, in the futures market. An HTA contract may be "flexible," which allows the parties to "roll forward" the delivery date to sometime in the future. When an HTA is rolled forward, the elevator buys back the original futures hedge and rehedges by selling a new futures contract in the futures market. The spread between the bought back and sold futures is attached to the price per bushel of the original HTA contract with the farmer. This change may be either a debit or a credit, and the farmer runs the risk of having the spread run against him. See Eby v. Producers Co-op, Inc., 959 F.Supp. 428, 430 n. 1 (W.D.Mich.1997) (Bell, J.).[16]
 
 
 34
 Although they may allow more flexibility than in a traditional cash forward contract, we nonetheless hold that HTA contracts which contemplate actual physical delivery of a commodity are cash forward contracts and are therefore excluded from coverage by the CEA and CFTC regulations.[17] "Self-serving labels" that a party may choose to give its contracts, however, are not themselves dispositive of the futures/cash forward question: the ultimate focus is on whether the contracts in question contemplated actual, physical delivery of the commodity. Noble Metals, 67 F.3d at 773 (citations omitted); see also Oeltjenbrun v. CSA Investors, Inc., 3 F.Supp.2d 1024, 1038 (N.D.Iowa 1998) (court must analyze separately HTA contracts with differing terms). We turn next to that inquiry.
 
 C.
 
 35
 In the well-reasoned opinion of In re Grain Land Cooperative, 978 F.Supp. 1267 (D.Minn.1997), the district court listed the following factors in support of its finding that the HTA contracts before it fit within the cash forward contract exclusion: (1) the grain elevator (Grain Land) entered into these contracts only with farmers and producers of grain--not with speculators from the general public; (2) each plaintiff was a farmer in the business of growing grain and had the ability to make delivery on the contracts; (3) Grain Land was in the business of obtaining grain under contracts for resale and relied on actual delivery of that grain to carry out its business; (4) Grain Land had the capacity to take delivery of the grain subject to the HTAs; (5) on their faces, the contracts were clearly grain marketing instruments, tools to accomplish the actual delivery of grain in exchange for money; (6) it was undisputed that delivery and payment routinely occurred between the parties in past dealings; and (7) the plaintiffs received cash payment on the contracts only upon delivery of the actual commodity. Id. at 1273-74. We agree with the Grain Land Court that these characteristics exemplify the types of transactions that Congress intended to exclude from the CEA.[18]
 
 
 36
 In the present case, the contracts in question exhibit the characteristics identified by the Grain Land Court. There is no evidence that The Andersons entered into these HTA contracts with anyone other than farmers/grain producers. Although Horton Farms as a corporate entity did not itself grow the corn, it was in the business of obtaining it on a regular basis from Rodney Horton and his son, Robert Horton, and had the ability to make delivery on the contracts. Similarly, The Andersons was in the business of obtaining corn under contracts for resale, relied on the corn's actual delivery to carry on its business, and had the capacity to take delivery of the corn subject to the HTA contracts. On their faces, the HTA contracts contemplated the actual and physical delivery of corn in exchange for money, notwithstanding that the price to be paid consisted of an agreed-upon variable that was to be finalized at a future time. Moreover, Horton Farms was to receive payment only after it fulfilled all of the contract terms, which included actual delivery. And finally, until the present dispute arose, the parties had a several-year history of delivery of corn and payment therefor under similar contracts.
 
 
 37
 Horton Farms argues that the HTA contracts in question do not contemplate "actual delivery" because they permit "infinite rolling." In support of this assertion, Horton Farms claims that there was an oral understanding that delivery was not expected, citing Rodney Horton's affidavit testimony that The Andersons orally represented that the contracts could be "repeatedly rolled forward, that delivery was not expected of me, and that I could easily get out of these agreements in the future, if necessary."[19] In arguing against summary judgment, Horton Farms also notes that a number of the contracts in question were in fact rolled forward and cites its expert's affidavit stating that references to "rolling forward" and "rolling up" are terms "strictly used" in regard to futures and futures markets.
 
 
 38
 Horton Farms has failed to present evidence sufficient to create a genuine issue of fact concerning whether the HTA contracts contemplated actual delivery.[20] The contracts explicitly state that the corn will be "tangibly exchanged" and that the seller will not contract to deliver more than it expects to own. The confirmation documents are integrated contracts and explicitly provide for actual, tangible delivery. See MICH. COMP. LAWS ANN. § 440.2202.[21] Thus, as an initial matter, Mr. Horton's averment to the contrary is inadmissible parol evidence. Id.; see also Salzman v. Maldaver, 315 Mich. 403, 24 N.W.2d 161, 165 (Mich.1946).
 
 
 39
 In addition, we fail to see how the statements by Horton Farms' expert are relevant. Mr. McCalla concludes only that the contracts in question are "inherently tied into the commodities futures market." The Andersons admits as much, given that one component of the price term in an HTA contract is pegged to the Chicago Board of Trade's futures price. Furthermore, the fact that speculative futures contracts are often "rolled" does not foreclose the use of such term to move forward an actual delivery date in contracts that are not futures contracts.
 
 
 40
 The contracts' terms provide that "Unpriced contracts will be rolled at Buyers discretion on or after the first notice day of the underlying futures option, unless prior arrangements have been made with The Andersons origination office," and that "The delivery period may be amended only by prior mutual agreement between The Andersons and Seller, and subject to The Andersons' sole discretion." Horton Farms may, of course, seek to explain the rolling provisions with course-of-dealing evidence. See MICH. COMP. LAWS ANN. § 440.2202. That some of the contracts in question were in fact rolled forward, however, does not mean that they may be rolled forward "infinitely." The very terms of the contract state that in order to roll the delivery period, one of two situations must exist: either (1) Horton Farms fails to establish the basis price within the applicable time period and The Andersons chooses to roll the contract forward; or (2) the parties agree in advance to roll forward the contract, "subject to The Andersons['] sole discretion." In other words, without the consent of both parties, the contract may not be rolled forward and actual delivery as contracted for becomes due. Moreover, given that Horton Farms had a long history of contracting with The Andersons and had previously fulfilled these contracts by actually delivering corn, the fact that some of the most recent contracts were rolled provides little support for a claim that the rolling would continue in perpetuity.
 
 
 41
 As noted by the Grain Land Court, despite the fact that in retrospect, a rolling feature may have introduced imprudent price risk, the instrument's principal purpose remained the sale of grain for deferred delivery. See 978 F.Supp. at 1276-77. For all of these reasons, we hold that these HTA contracts fit within the cash forward contract exclusion to the CEA and fall outside of CFTC regulation.[22]
 
 IV.
 A.
 
 42
 The Federal Arbitration Act ("FAA") provides:
 
 
 43
 A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save such grounds as exist at law or in equity for the revocation of any contract.
 
 
 44
 9 U.S.C.A § 2. The FAA establishes a "federal policy favoring arbitration ... requiring that we rigorously enforce agreements to arbitrate." Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (internal quotations and citations omitted). In Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), the Supreme Court reiterated that general state contract principles, as opposed to state laws applicable only to arbitration provisions, may regulate, and in the appropriate case, invalidate, arbitration clauses. See id. 517 U.S. 681, 116 S.Ct. at 1655-56 (citations omitted); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("When deciding whether parties agreed to arbitrate a certain matter ... courts generally should apply ordinary state-law principles that govern the formation of contracts.") (citations omitted). Thus, unless the provisions are unenforceable under state law contract principles, the arbitration provisions in the nine contracts govern.
 
 B.
 
 45
 Horton Farms asserts that Michigan's general contract principles require that we hold unenforceable the arbitration clauses, either because the provisions are adhesive and their enforcement would be unconscionable, or because the provisions are excluded pursuant to the UCC's "Battle of the Forms" rule.
 
 
 46
 To determine whether a provision is an unenforceable contract of adhesion, Michigan applies a two-prong test of "procedural" and "substantive" unconscionability. The test inquires: " '(1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?;[23] [and] (2) Is the challenged term substantively reasonable?' " Rehmann, Robson & Co. v. McMahan, 187 Mich.App. 36, 466 N.W.2d 325, 329 (Mich.Ct.App.1991) (quoting Allen v. Michigan Bell Telephone Co., 18 Mich.App. 632, 171 N.W.2d 689, 692 (Mich.Ct.App.1969)). The party seeking to invalidate the provision must show both types of unconscionability:Even if the contract is adhesive under the first prong, the challenged term is still enforceable if substantively reasonable and not oppressive or unconscionable. "Thus, merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable, it will be enforced. By like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties."
 
 
 47
 Id. (quoting Allen, 171 N.W.2d at 692) (internal citation omitted).
 
 
 48
 Under Michigan law, unconscionability is a question of law for the court to decide.[24] Citizens Ins. Co. of Amer. v. Proctor & Schwartz, 802 F.Supp. 133, 143 (W.D.Mich.1992) (citing Northwest Acceptance Corp. v. Almont Gravel, Inc., 162 Mich.App. 294, 412 N.W.2d 719, 722 (Mich.Ct.App.1987) (in turn quoting the Practice Commentary by Professor Roy L. Steinheimer, Jr., to MICH. COMP. LAWS § 440.2302)). The issue is determined based on the facts and circumstances that existed when the contract was made, not those extant at the time of the suit. Id. at 143, 144; MICH. COMP. LAWS ANN. § 440.2302(1). A reviewing court will uphold the trial court's unconscionability determination unless it is clearly erroneous. Northwest Acceptance Corp., 412 N.W.2d at 720, 724; Gianni Sport Ltd. v. Gantos, Inc., 151 Mich.App. 598, 391 N.W.2d 760, 761 (Mich.Ct.App.1986).
 
 
 49
 1. Procedural Unconscionability.
 
 
 50
 Horton Farms argues that the arbitration provisions are procedurally unconscionable because the bargaining-power disparity makes them "unduly oppressive," because The Andersons drafted the provisions and "buried" them in boilerplate instead of explicitly pointing to the terms and explaining to Horton Farms their significance, and because the provisions incorporate a set of rules that Horton Farms never saw until the present dispute. In addition, Horton Farms asserts that The Andersons is their "only viable outlet," and that the provisions were not negotiable.
 
 
 51
 In Allen v. Michigan Bell Telephone Company, 18 Mich.App. 632, 171 N.W.2d 689 (Mich.Ct.App.1969), the only telephone yellow pages company in the area included in a contract with its advertisers a clause limiting to the price of the contract the telephone company's liability for errors or omissions. The court found that the provision was substantively unreasonable, and that the "take it or leave it" nature of the relationship (the weaker party could not bargain for different terms) and the fact that this telephone company was the sole provider of the service sought rendered it procedurally unconscionable as well. Accordingly, the court refused to enforce the provision. Id. at 694.
 
 
 52
 In contrast, in Beaver v. Figgie International Corp., No. 87-1362, 1988 WL 64710 (6th Cir. June 24, 1988) (unpublished),[25] an employer renting scaffolding signed a rental agreement that included an indemnity provision. In holding that the contract was not procedurally unconscionable, we found dispositive the fact that the employer failed to show that it lacked a reasonable alternative to renting the equipment from Figgie on Figgie's terms. We rejected as well--in part because the employer had been renting equipment from Figgie for fifteen years--the employer's contention that the agreement was procedurally unconscionable because at the time he signed the contract no one explained to him the significance of the instrument. We noted "the absence of any evidence" that Figgie had altered the terms from those contained in previous agreements, and held that the mere fact that the contract was standardized and preprinted did not make it unenforceable. Id. at 1988 WL 64710 * 4.
 
 
 53
 Similarly, in Citizens Insurance Co., a commercial entity signed a fifteen-page sales agreement that contained an exclusion of consequential damages clause. Above the signature line was a statement warranting that the person signing the contract had read and understood the terms and conditions, including the warranties and liabilities section. The company president averred that no one explained or discussed the provision in question, that he did not have assistance of counsel at the time of signing, that he did not intend to give up any right to seek damages for injury caused by a defective product, and that at the time of signing, the product purchased was to his knowledge the only one of its type and capacity available. Relying on the fact that under Michigan law, a party cannot invalidate a contract because he or she did not read it, the district court held that there was no procedural unconscionability. The court noted that the party signing the contract did not state or imply that his ability to understand the provision was handicapped by illiteracy, inexperience, or lack of business acumen. 802 F.Supp. at 144. The court also noted that the party did not describe the extent of his search for an alternative, or explain the nature of any disadvantage of using an alternative. Id. at 145.
 
 
 54
 Read collectively, these cases make it clear that the most important factors in determining procedural unconscionability are (1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable. See also Northwest Acceptance Corp., 412 N.W.2d at 723-24 (affirming finding of procedural unconscionability because no realistic alternative to acceptance of terms).[26]
 
 
 55
 Horton Farms has failed to present evidence that it searched for other alternatives and that there were none. Mr. Horton's affidavit is internally inconsistent: he states that at the time Horton Farms entered into the contracts at issue, The Andersons was the only viable outlet for his grain; but he also states that since this dispute has arisen, he has been "blackballed" by other grain dealers and traders within the market. Similarly, in its brief, Horton Farms essentially admits that it had at least some alternative buyers, stating that The Andersons controls a "significant portion" of the relevant grain market, and that Horton Farms had "limited choices" of companies to whom it could sell corn. Both Mr. Horton's affidavit and Horton Farms' appellate brief state that since bringing this suit, Horton Farms has been unable to sell corn to other national grain dealers. The fact that these other companies are now unwilling to deal with Horton Farms, however, is beside the point: we look at what its alternatives were at the time it entered into the contract; in other words, if The Andersons had refused to alter the arbitration clause, were there alternative grain outlets with which Horton Farms could have done business, which did not require arbitration before the NGFA. See Citizens Ins. Co., 802 F.Supp. at 143-45. Other than the inconsistent statements in Mr. Horton's affidavit, Horton Farms has provided no evidence whatever in this regard.
 
 
 56
 Similarly, Horton Farms has failed to show that the arbitration provisions in the contracts with The Andersons were not negotiable. Despite the fact that The Andersons is a corporation much larger than Horton Farms, Mr. Horton is an experienced farmer who, on behalf of Horton Farms, entered into a number of prior contracts containing clauses similar to the arbitration provisions currently at issue. The only evidence Horton Farms cites is the following deposition response by the Regional Controller for The Andersons' Agricultural Group:
 
 
 57
 Q: What would happen if a customer refused to sign the contract with these terms on the back?
 
 
 58
 A: I can't really say specifically. My only assumption would be that we wouldn't have a contract. We wouldn't--we wouldn't enter into that contract arrangement, then, with the customer.
 
 
 59
 In addition to its equivocal nature, this statement does not foreclose the possibility that specific terms, in particular the arbitration provisions, may be altered. The first sentence of the one page list of terms in each of these contracts states that the Seller must notify The Andersons if the Seller disagreed with any of the terms. Notwithstanding this provision, Horton Farms signed the contract and made no attempt to negotiate a different dispute resolution clause. On at least one prior occasion, however, Horton Farms did refuse to sign an agreement with The Andersons, negotiated with agent Hartung, because it contained a particular choice-of-law clause. Although it is unclear from the record what the substance of that agreement concerned, Hartung testified that he responded by telling Mr. Horton to change the document to read as he wanted it to, initial the change, and Hartung would send it to The Andersons' home office for consideration.
 
 
 60
 If Horton Farms had made some attempt to negotiate the arbitration provisions, we might be more sympathetic to a claim of procedural unconscionability, but in this case, it appears that Mr. Horton simply failed to contemplate the potential consequences in advance. Horton Farms argues merely that it did not discuss or agree to the arbitration terms with The Andersons and that it was "not at any time aware of the fact that The Andersons treated arbitration as a term of their agreement with Horton Farms, Inc." Absent fraud or mutual mistake, however, a commercial entity signing a contract is expected to have read the provisions therein and understood their binding effect. See Paterek v. 6600 Limited, 186 Mich.App. 445, 465 N.W.2d 342, 345 (Mich.Ct.App.1990). Although it is somewhat troubling that Horton Farms never received a copy of the NGFA rules that would govern any dispute, it is also the case that each contract explicitly stated that those rules were binding on the parties and governed the resolution of all disputes arising under the contract. Horton Farms never requested a copy of the rules. On these facts, we will not find procedural unconscionability.
 
 
 61
 2. Substantive Unconscionability.
 
 
 62
 Even had Horton Farms sufficiently shown procedural unconscionability, it has failed to show that the substance of the arbitration clause is unconscionable. Horton Farms essentially claims that the provision is "patently unfair" because it requires arbitration before an allegedly systemically biased tribunal, the NGFA. The parties agree that the substance of the arbitration agreement should be analyzed under the "evidently partial" test adopted in Apperson v. Fleet Carrier Corp., 879 F.2d 1344 (6th Cir.1989). See 9 U.S.C.A. § 10. Under that test, evident partiality will be found " 'where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.' " Id. at 1358 (quoting Morelite Constr. Corp. v. New York City District Council Carpenters Benefit Funds, 748 F.2d 79, 84 (2d Cir.1984)). This is a higher standard than an "appearance of bias," but requires a lesser showing than "actual bias." Id.
 
 
 63
 Although it is true that The Andersons is a NGFA member with an employee on the NGFA Board of Directors, that The Andersons pays approximately $26,000 in yearly membership dues, that the NGFA membership in large part consists of grain elevator operators, and that the NGFA requires that every NGFA arbitrator be a dues-paying member,[27] it is also true that a number of farmer-owned cooperatives are also NGFA members. The parties choosing the arbitration panel have no pecuniary relationship with The Andersons, and, in addition to providing for other procedural safeguards, the NGFA rules provide that the arbitrators may not themselves have a commercial interest in a particular dispute. In light of the inclusion of farmer-owned cooperatives in NGFA membership as well as the existence of procedural safeguards, we decline to hold that as a matter of law a "reasonable person" would have to conclude that this system is biased. See Ryoti v. Paine, Webber, Jackson & Curtis, Inc., 142 Mich.App. 805, 371 N.W.2d 454, 456 (Mich.Ct.App.1985) (finding that despite a presumption of bias against an arbitration committee composed entirely of New York Stock Exchange members to resolve disputes between the Exchange members and registered agents, the procedures employed by the Exchange "at least possessed minimum levels of integrity and therefore any presumption of bias is rebutted.").[28]
 
 C.
 
 64
 Horton Farms also argues at some length that the arbitration clause is a "material alteration" that, under the Battle of the Forms rule, should be treated as a proposed contract addition to which it did not agree.
 
 
 65
 As an initial matter, we note that under Michigan law, a sales contract may be modified without additional consideration. MICH. COMP. LAWS ANN. § 440.2209(1). Thus, Horton Farms' contention that the preexisting oral contracts did not include an agreement to arbitrate does not resolve this matter. Moreover, contrary to the parties' assertions, this case does not present a "battle of the forms" issue, because by signing each and every written "Purchase Contract and Confirmation," Horton Farms expressly assented to the additional terms, material or not. Battle of the forms questions arise when a confirmation form that a party uses to accept an offer alters the offer's terms; the UCC solution was created to get out from under the "mirror image rule" problem. See MICH. COMP. LAWS ANN. § 440.2207; Dorton v. Collins & Aikman Corp., 453 F.2d 1161, 1165-66 (6th Cir.1972). In contrast, in this case, Mr. Horton received the document, supposedly read it, and signed it on behalf of Horton Farms, thereby affirmatively agreeing to the terms contained therein. See American Parts Co., Inc. v. Amer. Arbitration Assoc., 8 Mich.App. 156, 154 N.W.2d 5, 14-16 (Mich.Ct.App.1967) (if arbitration provision is an "additional term," under MICH. COMP. LAWS ANN. § 440.2207, it would be deemed a proposal for an addition to the contract; even if a "material alteration," it becomes part of the contract if the other party expressly agrees to it).
 
 
 66
 In both cases relied upon by Horton Farms, American Parts and Dorton, the party claiming a material alteration never signed the document containing the disputed terms; thus, a different question was before the court. Horton Farms argues that Mr. Horton's signature is irrelevant because he believed that his signature was necessary to confirm the material terms set forth on the front of the contract. In addition to the fact that the fronts of the contracts do reference the reverse-side terms, however, Michigan law makes clear that absent a showing of fraud or mutual mistake, a party to a contract may not seek to invalidate it on the basis that he did not read it or thought that its terms were different. See Paterek v. 6600 Limited, 186 Mich.App. 445, 465 N.W.2d 342, 345 (Mich.Ct.App.1990). Thus, we hold that the parties agreed that the arbitration provision would be part of the contract.
 
 D.
 
 67
 Horton Farms also contends that the question of whether it entered into a valid and binding arbitration agreement should have been submitted to a jury. The FAA provides in pertinent part:
 
 
 68
 The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof. Where such an issue is raised, the party alleged to be in default may ... demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury.... If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.
 
 
 69
 9 U.S.C.A. § 4.
 
 
 70
 In Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51 (3d Cir.1980), the parties entered into an oral sales contract. The seller sent to the buyer a form entitled "Contract," which had a space designated for the "Buyer's Acceptance" and incorporated an arbitration clause on the reverse side. The production manager signed and returned the contract, and it was undisputed that the parties had not discussed the arbitration term. The Third Circuit held that there was a material issue of fact about whether the parties had agreed to arbitrate and therefore required a jury trial. The court stated: "A naked assertion ... by a party to a contract that it did not intend to be bound by the terms thereof is insufficient to place in issue 'the making of the arbitration agreement' for purposes of Section 4 of the [FAA]. An unequivocal denial that the agreement had been made, accompanied by supporting affidavits, however, in most cases should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds.' " Id. at 55 (quoting Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673 (2d Cir.1972)). The court stated that the jury would determine whether the production manager was authorized to enter into a contract on behalf of the company and that the form of each confirmation was such that its execution constituted an agreement. Id.
 
 
 71
 In Baghdady v. Sadler, No. 92-1214, 1992 WL 217410, (1st Cir. Sept.9, 1992) (unpublished), however, where the defaulting party, Baghdady, signed an options contract with Merrill Lynch that contained an arbitration clause and then asserted that he had not read the document's text and did not intend to enter into an arbitration agreement, the First Circuit stated: "Although these may be disputed matters, they are not material." Id. at 1992 WL 217410 * 2. The Court distinguished Par-Knit: the material fact there was whether the production manager had authority to sign. Noting that there was no suggestion that Baghdady was prevented from reading the document before signing, and that there was no dispute that Baghdady had authority to bind himself, since the language was clear on its face, "there is no issue for a trial, jury or non-jury." Id.
 
 
 72
 In our opinion, Baghdady sets out the correct approach: if the provision is clear, and the defaulting party (with authority) has signed it, there is no jury issue. Therefore, because it is undisputed that Mr. Horton, as President of Horton Farms, had the authority to bind Horton Farms, and because the contract provision clearly states that the parties will submit all contract disputes to arbitration before the NGFA, Horton Farms was not entitled to a jury trial on this issue.[29]
 
 V.
 
 73
 Finally, we address the district court's confirmation of the arbitration award. The FAA expresses a presumption that arbitration awards will be confirmed. Booth v. Hume Pub., Inc., 902 F.2d 925, 932 (11th Cir.1990); see also 9 U.S.C.A. § 9 (if the parties have agreed to judicial confirmation of the award, "the court must grant such [a confirmation] order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."). Courts play only a limited role in reviewing arbitration decisions, and "are not permitted to consider the merits of an arbitration award even if the parties allege that the award rests on errors of fact or misinterpretation of the contract." Shelby County Health Care Corp. v. American Fed'n of State, County & Municipal Employees, 967 F.2d 1091, 1094 (6th Cir.1992) (citing United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 367, 98 L.Ed.2d 286 (1987)). A federal court may set aside an arbitration award under the FAA only upon a finding that certain statutory or judicial grounds are present. See Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132, 135 (6th Cir.1996).
 
 
 74
 Horton Farms submits that the district court should have vacated the arbitration award on the basis of "evident partiality," pursuant to 9 U.S.C.A. § 10(a)(2).[30] Horton Farms asserts that the NGFA arbitrators were evidently partial, both "institutionally and individually." As noted in the preceding section, evident partiality will be found only "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358 (6th Cir.1989) (adopting standard announced in Morelite Const. Corp. v. New York City District Council Carpenters Benefit Fund, 748 F.2d 79, 84 (2d Cir.1984)). This standard requires a showing greater than an "appearance of bias," but less than "actual bias." Id. at 1358. The alleged partiality must be direct, definite, and capable of demonstration, and "the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator." Consolidation Coal Co. v. Local 1643, United Mine Workers of Amer., 48 F.3d 125, 129 (4th Cir.1995) (internal quotation marks and citations omitted); see also Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir.1985). In addition, when a party moves for summary judgment seeking to vacate an arbitration award, he must support such motion by "specific facts." See Apperson, 879 F.2d at 1359-61.
 
 
 75
 The district court found that Horton Farms failed to establish "specific facts" demonstrating that the award in this case was tainted by the arbitrators' partiality, and thus, that Horton Farms had failed to overcome the presumption of a valid award. More particularly, the court found that (1) the claimed systemic defects, i.e., the purpose of the NGFA (to protect its members in the marketplace), the fact that the arbitration panel is composed entirely of NGFA members, and the history of prior NGFA decisions, gave rise only to an appearance of potential partiality; and (2) Horton Farms did not otherwise impugn the impartiality of the arbitrators who actually served on the panel: the arbitrators did in fact consider and reject, albeit summarily, Horton Farms' UCC section 2-609 defense, and the arbitrators attested to their lack of bias or personal stake in the matter.
 
 
 76
 As an initial matter, we note that the district court correctly required Horton Farms to "submit evidence creating the reasonable impression that the present arbitrators were motivated by bias in their rendition of the award." Under Apperson, the party seeking invalidation must demonstrate more than an amorphous institutional predisposition toward the other side; a lesser showing would be tantamount to an "appearance of bias" standard. Moreover, as alluded to in the previous section, it is undisputed that over 1000 businesses, which range from agri-businesses such as The Andersons, to farmer-owned cooperatives, comprise the NGFA membership, and that the NGFA arbitration rules specifically require that arbitrators are selected from membership "with a view to forming each committee of prominent people experienced in the type of trade involved in the cases to be brought before it" and that the arbitrators chosen be commercially disinterested in the particular matter before them. We think that in light of these facts there can be no reasonable impression that the NGFA arbitration system itself is evidently partial. Cf. Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 148-49, 150, 89 S.Ct. 337, 339, 340, 21 L.Ed.2d 301 (1968) (opinion of the Court and White, J. concurring) (noting that arbitrators cannot sever all ties with the business world and that in fact, it is because of their business acumen that they are effective). We disagree with Horton Farms' asserted distinction between small farms and large farmer-owned/controlled agricultural cooperatives. In the context of this case, the NGFA does not become a biased entity simply because smaller farms tend not to be members. Like their smaller counterparts, large farmer-owned cooperatives have a vested interest in preventing agri-businesses from unfairly enforcing grain delivery contracts.
 
 
 77
 Horton Farms asserts that the individual arbitrators were evidently partial to The Andersons because the arbitrators all were affiliated with NGFA members, an organization of which The Andersons is a member and Horton Farms is not; because one of the arbitrators served on an NGFA committee with an employee of The Andersons; because the arbitration panel knew that Horton Farms had attempted to stay out of the NGFA arbitration system; because The Andersons obtained all the relief they requested; and because the arbitration panel allegedly gave short shrift in its opinion to Horton Farms' primary defense for refusing to deliver the corn, i.e., The Andersons refused to provide assurance of full payment for the corn at the time of delivery.
 
 
 78
 We agree with the district court that Horton Farms has not presented evidence of evident partiality on the part of any individual arbitrator sufficient to withstand summary judgment. An adverse award in and of itself is no evidence of bias absent some evidence of improper motivation. See Sheet Metal Workers, 756 F.2d at 746 ("Even repeated rulings against one party to the arbitration will not establish bias absent some evidence of improper motivation."). In addition, as noted by the district court, the arbitrators implicitly found that Horton Farms' demand for assurance was unreasonable and unjustified and therefore, not a proper ground for repudiation. We generally cannot review an arbitration proceeding for errors of law or fact, cf. Glennon, 83 F.3d at 136 (noting that the "manifest disregard of the law" standard is very narrow and that a mere error in interpretation of application of the law is insufficient), and in any event, we agree that the arbitrators' treatment of this defense does not give rise to a reasonable impression of bias. The arbitration decision stated that "defendant contended that plaintiff refused to give defendant assurances that plaintiff intended to make full payment for the deliver of the commodity," but concluded that defendant Horton Farms both understood and was contractually obligated to pay the disputed fees. Cf. Labor Relations Div. of Constr. Indus. of Mass., Inc. v. International Bhd. of Teamsters, 29 F.3d 742, 747 (1st Cir.1994) (arbitrators are not required to make formal findings or render extensive legal explanation for an award).
 
 
 79
 Moreover, all three arbitrators were employees of farmer-owned/controlled cooperatives; one of these cooperatives specialized in providing seed at low cost to its farmer members, the second is apparently a grain elevator owned entirely by the farmers that utilize it, and the third is apparently a grain-marketer. One of the arbitrators attested that members of his family are farmers and that he himself is a landowner with an interest in the grain grown on his land. Horton Farms has failed to establish how any one of these individuals was improperly motivated. Thus, we conclude that the district court properly entered judgment against Horton Farms and confirmed the arbitration award.
 
 CONCLUSION
 
 80
 Accordingly, the district court's decisions granting summary judgment in favor of Rodney Horton, as an individual, and in favor of The Andersons regarding its motions to compel arbitration and to confirm the arbitration award are AFFIRMED.
 
 
 
 [1]
 We agree wholeheartedly with Judge McKeague's observation that "very seldom has more been made of less in terms of the real dispute at issue in this case."
 
 
 [2]
 Prior to 1996, The Andersons, Inc., conducted business as The Andersons Management Corp. The new name replaced the former effective January 1, 1996. The contracts state that they are between "SELLER and THE ANDERSONS, an Ohio limited partnership ("Buyer"), by the Andersons Management Corp., its sole general partner."
 
 
 [3]
 In most cases, Mr. Horton negotiated with Arman Hartung, manager of The Andersons' Albion Grain location. However, two of the contracts at issue Mr. Horton negotiated with The Andersons' representatives Carol Schmucker and/or David Azkoul. On those contracts, their names and signatures appear in place of Arman Hartung's, and neither representative is designated as an agent
 
 
 [4]
 Other information is listed in this same space on the other seven contracts, but nothing therein refers to a particular person or entity as "seller" or "buyer."
 
 
 [5]
 To reduce their own resale risk, The Andersons "internally hedge" the prices they agree to pay farmers by trading on the commodities markets through a separate business entity, The Andersons Investment Services Corporation. While The Andersons Investment Services Corporation is a futures merchant and therefore regulated by the Commodity Futures Trading Commission ("CFTC"), the Chicago Board of Trade, and other exchanges, The Andersons is not a futures merchant and does not sell "calls" or other financial instruments to its customers
 
 
 [6]
 The Andersons is a dues-paying member of the NGFA; Horton Farms is not
 
 
 [7]
 Specifically, The Andersons informed Horton Farms that it would deduct from the purchase price approximately $30,000 in fees incurred by Horton Farms when it utilized the flex/convertible features of the contracts. Horton Farms disagreed with the fees and requested assurance that it would be paid in full, but The Andersons informed Horton Farms that, pursuant to the terms of the contracts, the fees would be deducted
 
 
 [8]
 We do not interpret The Andersons' argument here as an effort to use the contracts collectively to establish a course of dealing such that those contracts could then be used as evidence to explain an ambiguity as to the signatory capacity of Rodney Horton on each contract. See MICH. COMP. LAWS ANN. § 440.2202 (West 1994). Instead, The Andersons' approach is to use the contracts collectively to create such an ambiguity
 
 
 [9]
 Keidan involved a contract stating "I promise to pay to the order of Geo. Keidan...." The defendant signed his name as "W.S. Winegar, Agt.," but nothing on the contract made reference to a principal and nothing else on the instrument itself indicated that the parties intended that Winegar enter into the contract only in a representative capacity. Keidan, 54 N.W. at 901. Noting that the inclusion of "Agt." suggested representative capacity, but was not sufficient alone to prove the same, and that "the instrument, as a whole, is not sufficiently complete to point to other parentage," the court held that extrinsic evidence was admissible to prove that the parties did not intend to bind the signatory as a principal. Id. at 901-02
 
 
 [10]
 We note that The Andersons does not argue that Arman Hartung is a party to any contract which includes the language "This is an agreement between RODNEY HORTON and ARMAN HARTUNG," despite the fact that Hartung's signature does not identify him as an agent of The Andersons. That portion of the contract, whether naming Hartung or Schmucker or Azkoul, does not create any ambiguity; rather these clauses are most reasonably construed as identifying each party's representatives
 
 
 [11]
 Providing only a partial quotation, The Andersons implies that Keidan stands for the proposition that parole evidence should be admitted to clarify capacity in every case where a party seeks to rely on a representative description. In so arguing, The Andersons completely ignores the fact that Keidan was decided in a context where nothing else on the instrument indicated that the signatory was acting only as an agent
 
 
 [12]
 The Andersons also points to Mr. Hartung's handwritten notes indicating the "seller" as "Rodney." However, these suffer from the same defects as the contracts themselves: "Horton Farms" and the customer number is listed at the top of the page, and "Arman" is listed as the "buyer." The Andersons also points to a credit application of "Rodney Horton DBA Horton Farms" to Blondes Farm Supply of Michigan. According to The Andersons, Blonde's is a d/b/a of The Andersons. We fail to see how this supports a finding that a separate division of a sophisticated, multi-division corporation, which set up a customer account with "Horton Farms, Inc." and which never saw the Blonde's application, intended to hold Mr. Horton individually responsible for nine contracts entered into four years later
 
 
 [13]
 The CFTC provides very explicit rules regarding the form and use of arbitration clauses and requires that a pre-dispute agreement to arbitrate be separately endorsed, set forth in capital, boldface type, and use specified language. See 17 C.F.R. Part 180. Noncomplying arbitration agreements are unenforceable, see 17 C.F.R. § 180.3; 7 U.S.C.A. § 7a(11); Shearson Hayden Stone, Inc. v. Protzko, 98 Mich.App. 245, 296 N.W.2d 224, 225 (Mich.Ct.App.1980), and it is undisputed that the arbitration clauses in question do not conform to the CFTC requirements
 
 
 [14]
 In Salomon Forex, Inc. v. Tauber, 8 F.3d 966 (4th Cir.1993), the Fourth Circuit set out a particularly informative description of the distinction between futures contracts and forwards contracts:
 Because the [CEA] was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate "spot" transactions (transactions for the immediate sale and delivery of a commodity) or "cash forward" transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred). Thus § 2(a)(1)(A) of the [CEA], 7 U.S.C. § 2, provides that "futures" regulated by the [CEA] do not include transactions involving actual physical delivery of the commodity, even on a deferred basis. Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity "for future delivery" but excluded transactions involving "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2. The distinction, though semantically subtle, is what the trade refers to as the difference between "futures," which generally are regulated, and "cash forwards" or "forwards," which are not. [citations omitted]
 A "futures contract," or "future," never precisely defined by statute, nevertheless has an accepted meaning which brings it within the scope of transactions historically sought to be regulated by the CEA.
 It is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.
 In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.
 Id. at 970-71 (footnote omitted).
 
 
 [15]
 If the farmer does not set the basis price by a specified time, the basis is automatically set by the terms of the HTA. See Eby v. Producers Co-op, Inc., 959 F.Supp. 428, 430 n. 1 (W.D.Mich.1997). In the present case, the contracts provide that the seller must set the basis price prior to delivery and that "Unpriced contracts will be rolled at Buyers discretion on or after the first notice day of the underlying futures option, unless prior arrangements have been made with The Andersons['] origination office."
 
 
 [16]
 In The Andersons, Inc. v. Crotser, 7 F.Supp. 931, 932 n. 1 (W.D.Mich.1998) (Quist, J.), which involved a summary judgment motion on HTA contracts virtually identical to the present one, the court adopted as its own Judge Bell's description in Eby of the general attributes of HTA contracts. Our own review of the contracts and the record in this case, as well as other district court cases, leads us to conclude that this general characterization of such instruments is accurate
 
 
 [17]
 CFTC regulations provide that
 No futures commission merchant .... or associated person shall enter into any agreement or understanding with a customer in which the customer agrees, prior to the time the claim or grievance arises, to submit such claim or grievance to any settlement procedure except [if such agreement meets CFTC specifications].
 
 
 [17]
 C.F.R. § 180.3(b) (emphasis added); see also 7 U.S.C.A. § 7a(11). The term "claim or grievance" is defined as
 any dispute which arises out of any transaction on or subject to the rules of a contract market, executed by or effected through a member of that contract market or employee thereof which dispute does not require for adjudication the presence of essential witness or third parties over whom the contract market does not have jurisdiction and who are not otherwise available. The term claim or grievance does not include disputes arising from cash market transactions which are not a part of or directly connected with any transaction for the purchase or sale of any commodity for future delivery or commodity option.
 
 
 [17]
 C.F.R. § 180.1(a) (emphasis added). Although the double negative somewhat muddies the waters, it is clear from a close reading of these provisions that because cash forward contracts do not fall within the definition of "future delivery," disputes involving cash forward contracts are not "claims or grievances" subject to the CFTC arbitration rules
 
 
 [18]
 As the Grain Land court noted, the Ninth Circuit, in Co Petro, 680 F.2d at 578-79, and Noble Metals, 67 F.3d at 772-73, looked at similar factors in determining whether contracts fit within the cash forward contract exclusion. See Grain Land, 978 F.Supp. at 1274-75
 
 
 [19]
 The Andersons note that Horton Farms failed to allege "unlimited rolling" in either its Answer or its Counterclaim; the issue was raised for the first time in Rodney Horton's affidavit attached to Horton Farms' opposition to the summary judgment motion
 
 
 [20]
 Notwithstanding Horton Farms' claim to the contrary, the mere assertion of potentially infinite rolling does not create a disputed issue of fact. In Eby, the court observed that proof of potentially unlimited rolling was "a factor" in determining whether a contract fell within the cash forward exclusion. It therefore refused to dismiss for failure to state a claim a case alleging that an HTA contract allowed for infinite rollovers. 959 F.Supp. at 433. We interpret Eby as holding that unlimited rolling may be evidence showing that actual delivery is not contemplated. In any event, we think that the mere possibility of infinite rolling is not dispositive; whether actual delivery is contemplated remains the focal question
 
 
 [21]
 Section 440.2202 of the Michigan Uniform Commercial Code ("UCC") provides in pertinent part:
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
 (a) by course of dealing or usage of trade ... or by course of performance ...; and
 (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.
 
 
 [22]
 In both its initial and reply brief, Horton Farms argues at great length that the CFTC has the power to regulate the arbitration of any dispute tangentially related to commodities trading. Therefore, it asserts, even if these HTAs are not futures contracts, they still should be subject to § 180.3(b) arbitration requirements. In its fervor, however, Horton Farms forgets that both the authorizing statute and the regulations themselves specifically exclude cash forward contracts. Thus, once we find a cash forward contract, the CFTC is without jurisdiction. The cases Horton Farms cites all involve futures contracts and none involves cash forwards; they are therefore irrelevant
 
 
 [23]
 The Michigan Supreme Court has similarly stated that adhesion contracts are "characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under the circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement." Morris v. Metriyakool, 418 Mich. 423, 344 N.W.2d 736, 742 (Mich.1984) (citations omitted); see also Beaver v. Figgie Int'l Corp., No. 87-1362, 1988 WL 64710, at * 4 (6th Cir. June 24, 1988) (unpublished) (contract not procedurally unconscionable under Michigan law if at the time of contracting each party has a realistic alternative to acceptance of the terms offered) (citations omitted)
 
 
 [24]
 The Michigan UCC provides:
 If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
 MICH. COMP. LAWS ANN. § 440.2302(1).
 
 
 [25]
 We recognize that the citation of unpublished per curiam opinions is disfavored. We cite Beaver, however, because "there is no published [Sixth Circuit] opinion that would serve as well." See 6th Cir. R. 24(c)
 
 
 [26]
 Horton Farms relies in part on Martin v. Joseph Harris Co., Inc., 767 F.2d 296 (6th Cir.1985). In that case, we held unconscionable a disclaimer of warranty and limitation of liability clause in a sales contract between a farmer and a national seed producer. (A similar clause was used by the seed producer's competitors.) Therein, we relied in part on the disparity in relative strength and the national producer's failure to inform the farmer that the clause altered significant statutory rights. However, in addition to giving "considerable weight" to the district court's opinion that Michigan law would not permit the disclaimer to be enforced (something which we no longer do, see In re Grand Jury (Doe) v. United States, 932 F.2d 481, 487 (6th Cir.1991)), we made clear that we were relying on the unique facts of the case: the producer discontinued a seed treatment procedure that it had been using for 26 years to prevent a crop disease called "black leg." The sole notice of the change was provided in the corner of one page in a catalog. A significant portion of the farmer's crop was destroyed by the disease. In reaching our decision, we noted that the defect was latent, that the seed producer could have prevented it, and that the farmers had no control over it. Martin has no applicability to the present dispute
 
 
 [27]
 The Andersons argues that the purpose of selecting arbitrators from NGFA membership is to guarantee qualified arbitrators
 
 
 [28]
 Horton Farms claims that NGFA arbitration decisions overwhelmingly favor grain dealers over farm operations. Horton Farms has provided a synopsis of all NGFA arbitration decisions from 1975-1993, but not much by way of explanation. From what we can tell, the vast majority of arbitration decisions involve disputes between grain elevators and those parties further up the chain--not disputes with producers. It appears from the record that there have only been 14 decisions involving farmers. Of those decisions, 12 were in favor of grain elevators, 1 in favor of farmers, and 1 appears to be a draw. Horton Farms claims that there have been 21 decisions "involving individual local farmers," and that the "larger entities essentially prevailed" in 19 of those decisions. Although the decisions might be somewhat indicative of an industry bias, we think the small sample size is insufficient to support a finding that, as a matter of law, requiring a farmer to arbitrate before the NGFA is substantively unconscionable
 
 
 [29]
 Without citing any caselaw directly supporting its contention, Horton Farms also argues that because the NGFA rules require that each party sign an arbitration contract, the arbitration provisions in the contracts at issue were merely agreements to enter into a future arbitration contract, which the district court cannot compel them to do. This contention is without merit. If a party could get around its agreement to arbitrate in this fashion, the previous contract would have been superfluous. Cf. 9 U.S.C.A. § 4 (upon finding an agreement to arbitrate, the court "shall order" the parties to arbitration)
 Given the breadth of the arbitration clause (i.e., covering "any disputes or controversies arising out of this contract"), and because according to Horton Farms' own complaint it "proceeded to engage in transactions for the sale of corn with Plaintiff ... in conjunction with investment club activities," we also hold that the district court properly dismissed Horton Farms' counterclaims for breach of contract based on investment club overcharges. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.") (citations and internal quotations omitted). Similarly, because Horton Farms' recission claim is tied directly to the contracts' arbitration clauses, the district court also properly dismissed this counterclaim.
 
 
 [30]
 That section provides:
 (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration
 ...
 (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
 9 U.S.C.A. § 10.
 Horton Farms argues for the first time on appeal that in the alternative, we should vacate the award because it was rendered in "manifest disregard of the law," see Glennon, 83 F.3d at 136 ("Absent circumstances indicating that the arbitration process was tainted by fraud, corruption, or arbitrator misconduct, a federal court may also vacate arbitration awards made 'in manifest disregard of the law.' ") (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir.1995)); specifically, Horton Farms claims, the award disregards M.C.L. 440.2609, which permits a party with reasonable grounds to believe the other party to the contract will not perform to demand adequate assurance of due performance and to suspend his own performance, if commercially reasonable to do so, until such assurance is received, and in disregard of the requirement that The Andersons must prove actual damages. Horton Farms also now asserts that the NGFA awarded to The Andersons attorney fees and interest without giving Horton Farms an opportunity to submit objections. Because Horton Farms failed to raise these arguments below, we will not address them on appeal. See Foster v. Barilow, 6 F.3d 405, 407 (6th Cir.1993).