**In re James Allen GRAY, Judy Ann Gray, Debtors.**

**Bankruptcy No. 99–50415.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Aug. 31, 2000.

Grady L. Pettigrew, Jr., Cox, Stine & Pettigrew Co, L.P.A., Columbus, OH, for debtors.

William B. Logan, Jr., Luper Sheriff & Neidenthal, Columbus, OH, for The Richwood Banking Co.

Frank M. Pees, Worthington, OH, Chapter 12 Trustee.

Ray A. Cox, Cox & Ginger, Dayton, OH, for Champaign Landmark, Inc.

Alexander G. Barkan, Columbus, OH, Assistant U.S. Trustee.

### *MEMORANDUM OPINION AND ORDER*

CHARLES M. CALDWELL, Bankruptcy Judge.

This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law on the objection of the Debtors, James Allen Gray and Judy Ann Gray, to the claim of Champaign Landmark, Inc. ("Champaign"), and Champaign's memorandum in opposition. The following issues are raised:

1. Whether the doctrine of *res judicata* precludes this Court from reviewing the merits of the objection to Champaign's claim;

2. Whether an arbitration award entered against James Allen Gray and in favor of Champaign should be vacated on the ground the arbitration proceeding and/or the panel of arbitrators were biased in favor of Champaign; and

3. Whether three contracts between Champaign and James Allen Gray violate 7 U.S.C. §§ 6(a) and/or 6c(b) of the Commodity Exchange Act.

As to the first issue, the Court concludes Champaign has failed to sustain its burden

of demonstrating that the prior district court litigation or the arbitration proceeding are sufficiently similar to invoke the doctrine of *res judicata* as to the issues raised in the objection. As to the second issue, the Court concludes the arbitration award was not properly challenged under the Federal Arbitration Act. As to the final issue, the Court holds that Contracts 2681 and 2063 are enforceable "cash forward" contracts, and are not subject to the Commodity Exchange Act (the "CEA"). As to Contract 5436, however, the Court holds that it is subject to the CEA, and it violates sections 6(a) and 6c(b). On these bases, Champaign's claim is allowed in the amount of $160,187.15. A discussion of the history of this case and the nature of the contractual relationship between the parties will facilitate an understanding of the Court's decision.

James Allen Gray ("Debtor") has been a farmer since graduating from high school in 1974, and he farms 1,000 acres, primarily in grain. Champaign is a cooperative whose members, including the Debtor, are farmers from the area surrounding Urbana, Ohio. Champaign's business consists primarily of buying and selling grain, and the Debtor and Champaign have done business since at least the early 1990s. The transactions in dispute are typical of the many in which the Debtor and Champaign successfully engaged during the course of their relationship.

Upon determining his anticipated production for an upcoming crop year, the Debtor contacted Champaign in order to arrange for the future sale of crops. The Debtor and Champaign negotiated the time of delivery, the delivery location, the quantity and grade of grain to be sold, and at least part of the eventual price upon delivery. Once these terms had been reached during a telephone conversation, Champaign forwarded to the Debtor a written "Confirmation of Grain Purchase Contract" ("Confirmation"). These Confirmations set forth the agreed upon terms, as well as additional terms that the Debtor was deemed to have unconditionally accepted unless he contacted Champaign immediately and asked for modifications. The Debtor routinely executed these Confirmations and returned them to Champaign without modifications.

Contracts such as those between the Debtor and Champaign are widely utilized in the agriculture industry and have become known as "Hedge–to–Arrive" ("HTA") contracts. There is no such thing as a "standard" HTA contract, and their terms vary widely within the industry. The HTA contracts at issue in this case had the following structure.

During negotiation of the HTA contract, the parties agreed as to one component of the price to be paid to the Debtor upon delivery, that being the per bushel futures price offered by the Chicago Board of Trade ("CBT") during the anticipated delivery month (the "HTA futures reference price"). The final price became the HTA futures reference price, adjusted to reflect any gain or loss on the futures market, minus the "basis," which would be determined at the time of delivery. The basis is the difference between the futures price and the actual cash price per bushel, at the time of delivery.[1]

In an attempt to guarantee funds sufficient to pay for the grain upon delivery, Champaign would then "hedge" its obligation on the CBT by placing an order to sell an exchange-traded futures contract that corresponded to the parameters of the HTA contract entered into with the Debtor. While the futures contract may have on its face called for the delivery of grain, Champaign never intended to make physical delivery of the crop. The hedging

---

1. Stated as an equation, the final HTA contract price (*i.e.,* that which would be paid to the Debtor upon delivery, of the grain) = HTA futures reference price ± (difference between HTA futures reference price and the futures price at the time of delivery) − (the futures price at the time of deliver − actual cash price at the time of delivery). The last parenthetical component of this equation is the basis.

transaction was entered into at the time of execution of the HTA contracts solely for the purpose of offsetting Champaign's obligations under the HTA contract.

All of the HTA contracts at issue here also contained terms that permitted the Debtor to defer delivery of the grain to a later date for a small per bushel fee. When the Debtor deferred, or "rolled" his delivery obligation, the HTA futures reference price was increased or decreased based upon the difference between the futures price at the time the roll was taken and the futures price for the new anticipated delivery month. Champaign would then "re-hedge" by selling its futures position on the CBT and purchasing another, which corresponded to the new HTA futures reference price.

None of the HTA contracts at issue contained express language limiting the number of rolls or duration of the period over which rolls could be taken. Champaign alleges that the parties understood delivery was required to occur within two crop years, although any number of rolls could occur within that time. The Debtor asserts that while no one told him he could roll indefinitely, no one told him he was prohibited from doing so. The Debtor, however, has consistently testified that he understood he eventually would be required either to deliver the grain promised under each of the contracts, or buy out his obligations.

There are three contracts at issue. Contract 2681 was executed on or about January 11, 1995, and it required the Debtor to deliver 70,000 bushels of corn in December 1995. Contract 2681 permitted the Debtor to roll his delivery obligation, but he was required to set the basis (*i.e.*, determine the final price) or elect to roll no later than November 30, 1995. If the Debtor chose to roll within the first crop year after Contract 2681's inception, a fee of one cent per bushel would be deducted from the final price. Rolls that deferred delivery into the second crop year were subject to a fee of three cents per bushel.

The HTA futures reference price under Contract 2681 was $2.5150 per bushel.

When the Debtor chose to roll his delivery obligation under Contract 2681, his contract price was impacted not only by the rolling fee, but by the previously described change to his HTA futures reference price as well. For example, when the Debtor initially chose to roll Contract 2681, his HTA futures reference price of $2.515 per bushel was decreased by the one cent per bushel rolling fee, then increased by the positive "spread" between the futures price for December 1995 and that for March 1996, the delivery period to which the Debtor's obligation was rolled. This spread was seven cents per bushel, which caused the Debtor's new HTA futures reference price to be set at $2.575 per bushel.

Unfortunately, as the Debtor continued to roll his delivery obligation, the spread between the futures prices did not continue to operate in his favor. At each subsequent roll, corn futures prices continued to decline, and the Debtor's HTA futures reference price was reduced by the negative spread, in addition to being reduced by the rolling fee. By the time Champaign canceled Contract 2681 in June 1997, due to the Debtor's failure to make delivery, the contract price had fallen to forty-one cents per bushel. Once a five cent per bushel cancellation fee had been assessed, and a $2.365 per bushel basis subtracted, the Debtor owed Champaign $2.0050 per bushel. Taking into account a delivery of 7,854.64 bushels in 1995, the Debtor owed $124,601.45 on Contract 2681.

Contract 2063 was executed on or about September 27, 1994. Pursuant to its terms, the Debtor became obligated to deliver 2,000 bushels of wheat in July 1995. The HTA futures reference price was set at $3.5925 per bushel, and Contract 2063 required the Debtor to set the basis or roll the delivery obligation by June 30, 1995. A fee of one cent per bushel was charged to roll during the first crop year, with a fee

of three cents per bushel charged for rolls deferring delivery into the second crop year.

In December 1994, Contract 2063 was combined with another outstanding contract, number 2002, which increased the Debtor's delivery obligation to 4,000 bushels. The new HTA futures reference price became $3.5513 per bushel. In February 1995, Contract 2063 was again combined. this time with Contract 2507. The Debtor then was required to deliver 5,000 bushels, and his HTA futures reference price became $3.6925 per bushel. During the summer of 1995, the Debtor delivered 3,650.59 bushels, reducing his delivery obligation to 1,349.41 bushels. In November 1995, however, Contract 2063 was combined with two more contracts, numbers 4574 and 5996, which raised his delivery obligation to 26,349.41 bushels. After several more rolls, and further delivery by the Debtor of 2,500 bushels, Champaign canceled Contract 2063 in June 1997. By that time, the Debtor's contract price had fallen to $1.8529 per bushel. With a five cent per bushel cancellation fee, and a basis of $3.2950 per bushel, the Debtor owed Champaign $1.4921 per bushel, or $35,585.70.

Contract 5436 was executed on or about May 31, 1995, and arose from certain terms contained within Contract 2681. As part of Contract 2681, the Debtor sold Champaign fourteen options to buy corn in July 1995. Such options to buy are known as "calls." Under these calls, the Debtor became obligated to deliver 70,000 bushels of corn if the CBT futures price hit $2.30 per bushel for July 1995. This occurred in May 1995, and as a result, the Debtor became obligated to deliver 70,000 bushels of corn sixty days after Contract 5436's inception, in addition to the 70,000 bushels due under Contract 2681. HTA contracts such as this, which arise from the sale of calls, are sometimes referred to as "Resultant HTAs."

Under Contract 5436, and as a result of his sale of calls, the Debtor became entitled to a premium of fifteen cents per bushel, which was added to his HTA futures reference price, making it $2.455 per bushel. Unfortunately, the Debtor fared no better under Contract 5436 than he did under Contract 2681. After several rolls, and no deliveries by the Debtor, Champaign canceled Contract 5436 in June 1997. By that time, the Debtor's contract price had fallen to forty-five cents per bushel. Once a five cent per bushel cancellation fee had been taken into account, and a basis of $2.365 per bushel subtracted, the Debtor owed Champaign $1.9650 per bushel, or a total of $137,550.00.

The Debtor's inability to deliver the corn and wheat promised under Contracts 2681 and 2063 was primarily due to weather conditions. The years 1995 and 1996 were very wet, and as a result, the Debtor's production capacity was significantly reduced.[2] The Debtor was forced to roll his delivery obligations under Contracts 2681 and 2063, not to take advantage of higher cash markets for crops, but simply because he had no crops. Given the adverse growing conditions, delivery at the original time under Contracts 2681 and 2063 became utterly impossible, although the parties could not have known this at the time these contracts were formed, due to the unpredictability of the weather.

The Debtor's ability to deliver at all under Contract 5436 was in serious doubt from its inception. When Contract 5436 was executed, the Debtor still had not satisfied his delivery obligations under Contracts 2681 and 2063, and the crop required under Contract 5436 was due in sixty days. Delivery of 140,000 bushels of corn and nearly 30,000 bushels of wheat would have exceeded the capacity of the

**2.** Weather conditions caused severe problems for farmers throughout the country during 1995 and 1996, and at least one author has cited this phenomenon as a factor in the nationwide HTA contract crisis. *See* Erik Asklesen, *Hedge–To–Arrive Contracts and the Commodity Exchange Act,* 7 Kan.J.L. & Pub. Pol'y 122, \*4 (1998).

Debtor's farming operations, as the Debtor testified he could only expect to produce 140 bushels of any given crop per acre. He would have been forced to plant corn in every square inch of the land he farmed in order to satisfy that obligation alone. At the time Contract 5436 was executed, the parties could not have legitimately expected the Debtor would be able to satisfy his delivery obligation under that contract. These concerns contributed to the negotiation of an agreement between Champaign and the Debtor in April 1996, to combine the delivery obligations under Contracts 2681 and 5436, reduce the total number of bushels due, and to spread delivery over three years. Under the terms of this agreement, 40,000 bushels were due in 1996, 40,000 in 1997, and 40,000 in 1998. When the Debtor proved unable to deliver even according to these terms, delivery was further spread, and he was required to deliver 33,145 bushels in 1996, 33,000 bushels in 1997, 33,000 bushels in 1998, and 33,000 bushels in 1999. The Debtor also did not perform according to these terms.

Shortly after the graduated delivery schedule was negotiated, the Debtor joined as a plaintiff in federal class action litigation commenced against Champaign and several other grain cooperatives and/or elevators by farmers who, as a result of HTA contracts, found themselves in predicaments similar to the Debtor's.[3] The plaintiffs raised claims under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968; state common law; and the CEA.[4] During the pendency of that litigation, the Debtor and Champaign agreed that their dispute would be submitted to binding arbitration before the National Grain & Feed Association ("NGFA"), pursuant to NGFA's rules governing arbitration. This agreement was memorialized in an agreed order entered by the District Court on April 11, 1997. The agreed order stayed the class

action litigation between the Debtor and Champaign, and referred the claims raised in the lawsuit and any other claim arising out of any grain purchase contract between the parties to binding arbitration before NGFA. The District Court retained jurisdiction for the purpose of converting any arbitration award to judgment and enforcement.

During the arbitration, the Debtor did not challenge the legality of the three contracts at issue under the Commodity Exchange Act. Instead, the Debtor asserted that the reductions in the per bushel contract price, made each time he rolled his delivery obligations, were taken without his consent, and for that reason he was not obligated to perform. On or about December 2, 1998, the arbitration panel unanimously found in Champaign's favor, citing a provision contained within each contract which stated that disputes would be resolved pursuant to NGFA Trade Rules, and finding the contracts in accordance with those rules. The arbitration panel immediately entered an award in the amount of $297,737.15. The Debtor did not appeal this award, and filed his petition for relief under chapter 12 of the Bankruptcy Code on January 20, 1999.

■ First, the Court will address the issue of whether the doctrine of *res judicata* precludes it from reviewing the merits of the Debtor's objection. In the Sixth Circuit, the doctrine of *res judicata* may be invoked when the following elements have been established:

1. a final decision on the merits by a court of competent jurisdiction;

2. a subsequent action between the same parties or their privies;

3. an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and

4. an identity of the causes of action.

3. *Carr, et al. v. Countrymark Cooperative, Inc., et al.*, No. C-2-96-1246 (S.D.Ohio).

4. The class action plaintiffs sought a declaratory judgment finding that HTA contracts were void or voidable under the CEA.

*Kane v. Magna Mixer Co., et al.,* 71 F.3d 555, 560 (6th Cir.1995). As the party arguing in favor of the application of *res judicata,* Champaign bears the burden of proof. 47 Am.Jur.2d, Judgments § 720 (1999). The Court finds the following elements dispositive, and will focus its analysis accordingly:

1. Whether the District Court or the arbitration panel addressed the issue of the validity of the HTA contracts under the CEA on its merits; and

2. Whether the class action litigation, the arbitration proceeding and this contested matter share an identity of causes of action.

■ According to the District Court's opinion and order dismissing the class action litigation pursuant to Fed.R.Civ.P. 12(b)(6), the class action plaintiffs raised several causes of action, including a demand for a declaratory judgment finding that contracts between the plaintiffs and defendants violated the CEA. Therefore, the validity of HTA contracts was an issue that was raised in the class action litigation, but further analysis of the District Court's dismissal order demonstrates that issue was not adjudicated on its merits.

In summarily disposing of the class action plaintiffs' demand for a declaratory judgment finding that HTA contracts violate the CEA, the District Court simply found that a demand for declaratory judgment could not confer jurisdiction to permit it to consider that question, particularly where the demand was asserted as an anticipated defense to pending or threatened state court litigation. Although the District Court also stated that "recent decisions in other federal courts show that allowing plaintiffs to amend to assert a CEA claim would be futile (citations omitted)," the Court finds this statement, without supporting analysis, insufficient to demonstrate that the validity of the HTA contracts at issue in the class action litigation was considered on the merits by the District Court.

■ As to whether the validity of HTA contracts under the CEA was considered by the arbitration panel, this Court finds it was not. The Debtor's answer to Champaign's arbitration complaint, as well as the report containing the findings of the arbitration panel, make no reference whatsoever to the CEA. Instead, these pleadings deal solely with the propriety of the adjustments made to the Debtor's final contract price each time he rolled his delivery obligation.

■ Under the doctrine of *res judicata,* identity of causes of action has been defined as "identity of the facts creating the right of action and of the evidence necessary to sustain each action." *Begala v. PNC Bank, Ohio, N.A.,* 214 F.3d 776, 780 (6th Cir.2000) *citing Sanders Confectionery Prods., Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 484 (6th Cir.1992). In the class action litigation, the plaintiffs raised causes of action under RICO, unspecified state law claims, and a demand for declaratory judgment under the CEA. Of these, the only causes of action addressed on their merits were those raised under RICO. The District Court found that the class action plaintiffs had failed to plead facts supporting the alleged violations of the relevant RICO provisions with sufficient particularity to withstand scrutiny under the defendants' motion to dismiss.

Other than the extremely limited information contained within the District Court's dismissal order, this Court has received no indication of what facts were pled in the class action litigation. The dismissal order refers to allegations regarding written and telephonic communications between the class action plaintiffs and defendants, but as the District Court noted, the plaintiffs did not point to specific communications, nor ascribe communications to particular defendants, in support of the allegations made under RICO. Aside from these vague references, this Court has before it no evidence establishing the facts pled in the class action litigation, and

surely cannot now be required to guess what they may have been, or whether they would be the same facts necessary to state a cause of action under the CEA.

The evidence of the facts before the NGFA arbitration panel is only slightly more substantial. The Debtor's answer in the arbitration proceeding, as well as the report of the arbitration panel, places Contracts 2063, 2681 and 5436 squarely at issue. As stated earlier, however, in arbitration the Debtor challenged these contracts on the grounds that the price modifications were made improperly and/or without his consent. These allegations do not require presentation of the same facts necessary to prevail under the CEA in this Court. Under the applicable NGFA Trade Rules, the inquiry into the propriety of the modifications focused on whether the Debtor executed and returned the Confirmations. The purpose underlying each of the contracts, the terms of delivery, and the parties' understanding as to the delivery requirements were not in issue in the arbitration, but they are key to this Court's analysis under the CEA. Therefore, the arbitration and this contested matter do not share an identity of causes of action.

In sum, the Court finds that Champaign has failed to demonstrate that the validity of the HTA contracts under the CEA was addressed on the merits during the arbitration proceeding or the class action litigation out of which it arose, or that those proceedings share an identity of causes of action with the contested matter under consideration here. Accordingly, the doctrine of *res judicata* does not preclude this Court from addressing the merits of the remaining issues raised by the Debtor in his objection to Champaign's proof of claim.

■ Addressing the second issue before the Court, the Debtor challenges the arbitration award, as well as the arbitration proceeding itself, by asserting both were biased in favor of Champaign, and failed to afford the Debtor procedural due process. The Sixth Circuit has held that "[a]n arbitrator's award will be binding on the parties unless they challenge the validity of the underlying contract to arbitrate under section 2 of the Federal Arbitration Act or seek to vacate, modify, or correct the award under section 10 or 11 [of the Federal Arbitration Act]," and further, that "in light of the strong federal policy in favor of enforcing arbitration agreements, courts only have a limited role in reviewing arbitration awards as authorized under the [Federal Arbitration Act]." *Decker, supra,* 205 F.3d at 910. Here, the Debtor's challenge has not been couched in the Federal Arbitration Act, but merely on unsupported assertions that the arbitration proceeding and/or the panel of arbitrators (and thus, the resulting award) were biased in favor of Champaign. Such vague allegations cannot serve as grounds upon which this Court can vacate the arbitration award.

■ The Court now will address the merits of the Debtors' objection to Champaign's proof of claim, in accordance with Section 502 of the United States Bankruptcy Code. The Debtor alleges HTA Contracts 2063, 2681 and 5436 violate sections 6(a) and 6c(b) of the CEA. If so, the contracts would be unenforceable against the Debtor, and his objection to Champaign's proof of claim could be sustained. Section 6(a) forbids transactions involving contracts for the purchase or sale of a commodity for "future delivery" unless such transactions are conducted on or subject to the rules of a board of trade designated by the Commodity Futures Trading Commission ("CFTC") as a "contract market" for that commodity. 7 U.S.C. § 6(a). The CEA excludes from its definition of future delivery any "sale of a cash commodity for deferred shipment or delivery." 7 U.S.C. § 1a(11). Contracts that arrange the sale of a cash commodity for deferred shipment or delivery are known as "cash forward" contracts, and cash forward contracts are exempt from regulation under the CEA. *Lachmund v. ADM Investor*

*Services, Inc.,* 191 F.3d 777, 786 (7th Cir. 1999); *Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 318 (6th Cir.1998).

■ As the Sixth Circuit has recognized, "[t]he purpose of this cash forward exception is to permit those parties who contemplate physical transfer of the commodity to set up contracts that (1) defer shipment but guarantee to sellers that they will have buyers and vice versa, and (2) reduce the risk of price fluctuations, without subjecting the parties to burdensome regulations." *Andersons,* 166 F.3d at 318. CFTC regulations are intended to control only transactions entered into for the purpose of speculation; they are not meant to govern contracts in which the commodity in question has an "inherent value" to the contracting parties. *Id.; Commodity Futures Trading Commission v. Co Petro Marketing Group, Inc.,* 680 F.2d 573, 579 (9th Cir.1982); *In re The Andersons, Inc.,* 1999 WL 10036, *4 (C.F.T.C. Jan. 12, 1999).

■ In considering whether a particular contract falls within the cash forward exception to the CEA, the determinative factor is "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Grain Land Coop. v. Kar Kim Farms, Inc.,* 199 F.3d 983, 991 (8th Cir. 1999); *The Andersons,* 166 F.3d at 320. In the case at bar, it cannot be disputed that both Champaign and the Debtor are parties who routinely engaged in the purchase and sale of grain. The Debtor is a farmer whose livelihood depends upon his production and sale of grain, and Champaign's business consists in large measure of buying grain for resale. It is also undisputed that the Debtor in the past had delivered grain to Champaign under HTA contracts similar to those at issue here, and had made partial delivery under Contracts 2681 and 2063. Further, both Champaign and the Debtor repeatedly admitted they understood that the Debtor was required to make actual delivery of grain or buy out his obligation under the relevant HTA contracts. No unilateral right of cancellation existed.

■ The Debtor urges this Court to find that Contracts 2681, 2063 and 5436 do not fall within the cash forward exception because their rolling provisions permitted him to defer delivery indefinitely, dispelling any argument that Champaign reasonably could have expected physical delivery of the grain. The Court finds this argument unpersuasive, as the "mere possibility of infinite rolling is not dispositive; whether actual delivery is contemplated remains the focal question." *The Andersons,* 166 F.3d at 320 n. 20.

■ The Court finds that the Debtor and Champaign shared a legitimate expectation that the Debtor would physically deliver the grain called for under Contracts 2681 and 2063, but finds this not to have been true as to Contract 5436. According to the Debtor's testimony, production and delivery of 70,000 bushels of corn and approximately 27,000 bushels of wheat were reasonable in light of the number of acres he farmed and the typical production capacity of each acre. Once Contract 5436 was executed, however, and the Debtor became obligated to deliver an additional 70,000 bushels of corn approximately sixty days later, both he and Champaign questioned whether such an obligation would prove possible to satisfy. These doubts are evidenced by the two agreements between the Debtor and Champaign, which at first reduced the number of bushels he was required to deliver, and then spread the delivery obligation over four years. Had the parties believed the original delivery obligation was within the Debtor's capacity, these arrangements would not have been necessary.

Contract 5436 also appears to have been entered into, not for the purpose of arranging the sale of grain, but for the purpose of taking advantage of anticipated favorable fluctuations in the corn futures market. The fact that the Debtor also

became obligated to deliver additional corn appears secondary. In addition, the Debtor had the option of buying out his obligation, rather than actually delivering the grain. While the Court recognizes that the Debtor had this right under all of the HTA contracts at issue, this fact should be emphasized in analyzing Contract 5436, where other facts indicate the parties did not possess a legitimate expectation that delivery of the grain would actually occur. *See In re Farmers Cooperative Co., et al.,* 2000 WL 256118, *6 (C.F.T.C. March 9, 2000) (the ability of producers to avoid delivery and instead capture the price movements in the futures markets by buying back the their obligations and being credited or debited for profits or losses, set the contracts apart from cash forward contracts and rendered them violative of section 6(a)).

■ The Court finds that Contracts 2681 and 2063 are cash forward contracts, are exempt from the CEA, and are enforceable against the Debtor. As to Contract 5436, however, the Court finds that given the Debtor's production capacity, with which Champaign admitted to being familiar, the fact that Contract 5436 required delivery of an additional 70,000 bushels of corn sixty days from the formation of the contract, and testimony establishing that the purpose of the contract was to speculate on the corn futures market, the parties did not legitimately expect the grain to be delivered in accordance with that Contract's original terms. Where a contract appears to have been entered into for the purpose of speculation, rather than to arrange physical delivery of a commodity, it cannot be found to be a cash forward contract, and is subject to regulation under the CEA. *In re Stovall,* 1979 WL 11475, *2 (C.F.T.C. December 6, 1979); *Co Petro, supra,* 680 F.2d at 579.

Therefore, the Court holds that Contract 5436 is not a cash forward contract. As it was not a cash forward contract, Contract 5436 was required to have been traded on or subject to the regulations of a board of trade recognized by the CFTC. As it was not, Contract 5436 violates section 6(a) of the CEA and is unenforceable against the Debtor.

■ The Debtor also challenged the HTA contracts at issue here under section 6c(b) of the CEA. Section 6c(b) provides that "no person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known to the trade as, an 'option,' . . . contrary to any rule, regulation, or order of the Commission prohibiting any such transaction . . . ." A commodity option "confers upon the holder the right to buy . . . or sell . . . either a specified amount of a commodity or a futures contract for that amount of a commodity within a certain period of time at a given price." *Farmers Cooperative,* 2000 WL 256118 at *7 *citing Commodity Futures Trading Comm'n v. U.S. Metals Depository Co.,* 468 F.Supp. 1149, 1154–1155 (S.D.N.Y.1979). Except when such transaction is undertaken on a designated contract market, "no person may offer to enter into, confirm the execution of, or maintain a position in, any transaction in interstate commerce involving wheat, . . . corn . . . [or] soybeans . . . if the transaction is or is held out to be of the character of, or is commonly known to the trade as an option . . . ." C.F.T.C. Regulation 32.2.

■ Contracts 2063 and 2681 bear no indicia of an option. They did not arise from the Debtor's sale of any calls, but were negotiated at arms length for the purpose of arranging the future sale of grain. Further, these contracts were not executed based upon a desire to speculate, *i.e.,* take advantage of anticipated futures market fluctuations. Both the Debtor and Champaign legitimately expected the quantity of grain set forth in each of the contracts to be produced and delivered, based on the Debtor's production capacity. This is not the case with respect to Contract 5436.

As previously, stated, Contract 5436 was executed when the corn futures market "struck" at $2.30 per bushel in May 1995, and as a result of calls sold under the terms of Contract 2681. Champaign has suggested that the purpose of entering into Contract 5436 was to permit the Debtor to enhance the price he was to receive by speculating on the futures market. Delivery of the corn called for under Contract 5436, however, was impossible, as it was due sixty days after the formation of the Contract, and at a time when the Debtor already was obligated to deliver an additional 70,000 bushels of corn under Contract 2681. Given these characteristics, the Court finds Contract 5436 to be in the nature of an option. As such, it was required to have been traded on or subject to the regulation of a designated commodity market. Because it was not, Contract 5436 violates sections 6(a) and 6c(b) of the CEA, and CFTC Regulation 32.2. *See In re The Andersons, Inc.*, 1999 WL 10036, *6–7 (C.F.T.C. January 12, 1999) (HTA contracts in which the sale of calls created additional delivery obligations "have all the characteristics of commodity options" and violate section 6c(b) of the CEA); *Farmers Cooperative*, 2000 WL 256118, *7 (HTA contracts arising from the sale of calls, and which created additional delivery obligations "have all the characteristics of commodity options" and violate CFTC Regulation 32.2 and section 6c(b) of the CEA).

In sum, Contracts 2681 and 2063 are valid, cash forward contracts which are not subject to, and therefore do not violate, sections 6(a) or 6c(b) of the CEA. As to Contracts 2681 and 2063, the Debtor's objection is **OVERRULED**. The amount due under Contracts 2681 and 2063 is $160,187.15, and Champaign's claim shall be allowed in that amount. Contract 5436 is not a cash forward contract, but rather an option, and therefore violates sections 6(a) and 6c(b) of the CEA. As a result, Contract 5436 is unenforceable against the Debtor, and his objection to Champaign's proof of claim, to the extent it is based on Contract 5436, is **SUSTAINED.**

**IT IS SO ORDERED.**