EVELYN BURKETTE HILL v. ROBERT LEE HILL

No. 883DC661

(Filed 5 July 1989)

1. **Principal and Agent § 1— property settlement agreement between parents—son not agent of father**

There was no merit to plaintiff's contention that her signature on a property settlement agreement and an amended agreement was procured by fraud, duress, and undue influence exerted by the husband through the parties' adult son, since there was no evidence that the son acted or had authority to act as agent for the husband when he threatened to terminate his relationship with plaintiff unless she settled the case or when he misrepresented that plaintiff's attorney had reviewed and approved the agreement when in fact he had not; there was no evidence that defendant had control over the adult son; plaintiff, not defendant, asked the son to go with her to her lawyer's office, and she, not defendant, instructed the son to bring the agreement to her and to take her to have it notarized; and even if the son did act as agent for defendant and did wrongfully procure plaintiff's signature, plaintiff was bound by her subsequent ratification of the agreements and acceptance of benefits under the agreements.

2. **Divorce and Alimony § 30— property settlement agreement—agreement not unfair or unconscionable**

There was no merit to plaintiff's contention that the parties' property settlement agreement was patently unfair and unconscionable where the husband did not affirmatively misrepresent or conceal the extent of the marital estate; the settlement terms were, for the most part, proposed by the wife; and the evidence plainly showed that plaintiff considered the agreements equitable when she entered into them.

3. **Divorce and Alimony § 30— property settlement agreement—no constructive fraud**

There was no merit to plaintiff's contention that the parties' property settlement agreements were a constructive fraud, since the fiduciary obligation normally existing between parties to a marriage had long been extinguished, and each party had employed independent counsel to represent them in the settlement negotiations and in the equitable distribution action.

**HILL v. HILL**

[94 N.C. App. 474 (1989)]

APPEAL by plaintiff from *E. Burt Aycock, Jr., Judge*. Judgment entered 10 March 1988 in District Court, CRAVEN County. Heard in the Court of Appeals 14 February 1989.

*Stubbs, Perdue, Chesnutt & Wheeler, by Trawick H. Stubbs, Jr., Marcus W. Chesnutt, Gary H. Clemmons, and Norman B. Kellum, for plaintiff-appellant.*

*Charles William Kafer and Dallas Clark, Jr., for defendant-appellee.*

BECTON, Judge.

The question presented by this appeal is whether the trial judge properly entered summary judgment in favor of the defendant-husband in the plaintiff-wife's equitable distribution action.

Evelyn Burkette Hill ("the wife") and Robert Lee Hill ("the husband") were married in April 1959. In September 1985, the wife filed the present action seeking an absolute divorce and an equitable distribution of marital property. Although the divorce was granted in March 1986, the equitable distribution claim remained to be resolved at a later date. The parties ostensibly settled the outstanding claim by entering into a property settlement agreement on 14 May 1987 and an amended agreement on 26 May 1987. In January 1988, the husband moved for summary judgment, raising the agreements as a bar to equitable distribution. The motion was granted.

The wife appeals, contending that her signature on the agreements was procured by fraud, duress, and undue influence exerted by the husband and by the parties' adult son Kevin. She also contends that the agreements are patently unfair and a constructive fraud, and that the husband breached the agreements by failing to provide her with medical insurance. For the reasons that follow, we affirm the order of the trial judge.

I

The following facts, drawn from the pleadings, depositions, and affidavits appearing in the record on appeal, show the circumstances which led to the wife signing the 14 May 1987 property settlement agreement and the 26 May 1987 amended agreement.

A.  14 May Property Settlement Agreement

The wife experienced emotional stress, and her relationship with her son Kevin suffered during the 14 months after the divorce that the equitable distribution claim remained unresolved. Believing that her relationship with Kevin would improve once the case was over, the wife called him weekly during this period to discuss the case, her desire to settle it, and what she hoped to obtain in settlement. Kevin, who lived with and worked for the husband, felt he had been cast in the role of mediator, delivering messages from his mother to his father. Several times Kevin urged the wife to "get the thing over with." The parties' other two children also had told the wife "they couldn't get on with their li[ves]" until this issue between their parents was resolved.

On 11 May 1987, the wife called Kevin at work. She was crying and upset because he had failed to call her on Mother's Day. During their conversation, she told Kevin that although she wanted to settle the case, one of her attorneys, Mr. Kellum, did not want her to. She explained that "[s]he wanted the documents drawn up the way she wanted . . ., and *[her lawyer] didn't think that was right*." (Emphasis added.) She asked Kevin to meet her at Mr. Kellum's office later that day to provide "moral support" when she told the attorney of her plans to "drop everything." Kevin agreed to come to the meeting.

The wife was "crying real hard" when Kevin got to Mr. Kellum's office. She told Kevin that Mr. Kellum "was not going to stop this case." Kevin reiterated to the attorney the wife's wish to "drop everything," and "just told [Mr. Kellum] to do what she wanted." At some point during the meeting, Kevin threatened to sever his relationship with his mother unless she settled the case.

In the wife's presence, Mr. Kellum then discussed with Kevin what she had said she wanted in settlement. These terms included: (1) a $90,000 to $100,000 house; (2) furniture for the house; (3) $1,000 a month for life; (4) hospital and medical insurance coverage for life; (5) a late-model automobile; and (6) $25,000 to $30,000 for costs and attorneys' fees. Kevin relayed the proposal to the husband, and later informed Mr. Kellum that the husband agreed to the terms. Mr. Kellum then communicated the terms to the husband's lawyer, Mr. Kafer, who was to draw up the agreement.

On 13 May, the wife called the husband and told him that she preferred to receive $60,000 in lieu of the house because Kevin,

who was in the building supply business, had told her that he could have a new house worth $100,000 built for that amount. The husband instructed his lawyer to make that change to the agreement. He also instructed Mr. Kafer to make the following changes—changes of which the wife was unaware—to wit: (1) that the agreement obligate the husband only to "ascertain" that the wife was covered with medical insurance, since she had recently remarried and was covered by her new husband's insurance policy; (2) that the $1,000 monthly payment be designated "alimony" payable until his death or her death; and (3) that her attorneys be paid "reasonable attorney[s'] fees" at a rate of $90 per hour.

On 14 May, the wife called Kevin and asked him to pick up the completed agreement from the husband's attorney, to bring it to her at work, and to take her to have it notarized. Neither the wife nor Kevin had been told about the additional changes in the agreement.

According to the wife's affidavit, when Kevin arrived, she asked if the papers could be taken to Mr. Kellum for his review, "but Kevin indicated that . . . the papers [could be] notarized anywhere and that *everything between the lawyers was 'all set.'* " (Emphasis added.) In fact, Mr. Kellum had not had an opportunity to review the agreement until after it was signed; had he reviewed it, he would have advised the wife not to sign it.

"At Kevin's suggestion that [they] not go to Mr. Kellum's office," the agreement was taken to the wife's bank to be notarized. Although she "glanced at the papers," she "did not review [the agreement] thoroughly [and] did [not] go through each paragraph" before signing it. After the agreement was signed and notarized, the wife was given a $60,000 check.

B. 26 May Amended Agreement

A few days later, the wife asked the husband to provide her with $8,500 instead of the late-model car. He agreed. An amended agreement, to which the 14 May agreement was attached and incorporated by reference, was drawn up to reflect that change. The amended agreement provided that the parties ratified the remaining provisions of the 14 May agreement. On 21 May, the husband's attorney delivered the amended agreement to Mr. Kellum's office, along with a copy of the 14 May agreement and a letter asking Mr. Kellum to call him immediately about the matter. However,

for reasons not apparent from the record on appeal, Mr. Kellum did not do so, and did not communicate with the wife until sometime in June.

On 26 May 1987, the wife went to Mr. Kellum's office to sign the amended agreement left there by Mr. Kafer. Although her attorney was not in the office, the wife obtained the amended agreement from his secretary. After the amended agreement was signed and notarized, the wife was given the $8,500 check.

In addition to the $68,500, the wife has received $1,000 each month since June 1987, as well as new living room, dining room, and bedroom furniture, and a washer, a dryer, a refrigerator, and a color television set. The husband has not provided medical insurance for the wife, although he did speak to insurance representatives and told her she needed to make an appointment for a physical, which she did not do.

II

[1] The wife contends that summary judgment in the husband's favor was inappropriate because her signature on the 14 May and 26 May 1987 agreements was procured by fraud, duress, and undue influence exerted by the husband through Kevin.

Summary judgment was properly granted only if the pleadings, depositions, affidavits, and admissions showed that no genuine issue existed as to any material fact and that the husband was entitled to judgment as a matter of law. N.C. Gen. Stat. Sec. 1A-1, R. Civ. P. 56(c) (1983). The husband demonstrated his entitlement to summary judgment by presenting evidence of the 14 May and 26 May agreements, which, by their terms, settled the equitable distribution issue. The burden thus shifted to the wife to forecast evidence showing that a genuine issue of material fact remained.

To challenge the motion, the wife averred in her affidavit that Kevin induced her to sign the 14 May agreement (1) by threatening to terminate his relationship with her unless she settled the case, and (2) by misrepresenting that her attorney had reviewed and approved the 14 May agreement when in fact he had not. However, even viewing all of the evidence in the light most favorable to the wife, we cannot say that any genuine issues of material fact remained for trial.

**HILL v. HILL**

[94 N.C. App. 474 (1989)]

First, the wife forecast no evidence that Kevin acted—or had authority to act—as agent for the husband when he made the misrepresentations and threats which allegedly induced her to enter the 14 May agreement. Nor was evidence forecast that the husband had control over Kevin. *See Vaughn v. Dept. of Human Resources*, 37 N.C. App. 86, 91, 245 S.E. 2d 892, 895 (1978), *aff'd*, 296 N.C. 683, 252 S.E. 2d 792 (1979). The evidence concerning Kevin's agency shows that the wife, not the husband, asked Kevin to go with her to her lawyer's office, and the wife, not the husband, instructed Kevin to bring the agreement to her and to take her to have it notarized. Moreover, Kevin was not aware of or involved with the 26 May agreement. Because "[i]t would be manifestly unjust to hold one party liable for the actions taken by [a third] person if that person did not have authority to act for him," *id.*, an alleged principal is entitled to summary judgment when, as here, insufficient evidence was presented to raise a genuine issue as to the existence of an agency relationship. *McGarity v. Craighill*, 83 N.C. App. 106, 109, 349 S.E. 2d 311, 313 (1986), *disc. rev. denied*, 319 N.C. 105, 353 S.E. 2d 112 (1987).

Second, even if Kevin had acted as agent for the husband and had wrongfully procured the wife's signature on the 14 May agreement, we would nonetheless be compelled to conclude that the wife was bound by her subsequent ratification of the agreements. "It is elementary that a transaction procured by either fraud, duress or undue influence may be ratified by the victim" so long as, at the time of ratification, "the victim had full knowledge of the facts and was then capable of acting freely." *Link v. Link*, 278 N.C. 181, 197, 179 S.E. 2d 697, 706 (1971). Here, the wife forecast no evidence that the alleged fraud, duress, or undue influence continued to operate at the time she signed the 26 May agreement, or that these forces operate even now when she accepts the $1,000 paid each month by the husband. The materials before us plainly show that the wife has continued to accept the benefits of both agreements long after she became aware of the alleged wrongdoing. She cannot now avoid the same contracts she acquiesced in for months and the benefits of which she still enjoys. *Accord Jones v. Jones*, 261 N.C. 612, 613, 135 S.E. 2d 554, 556 (1964); *Ridings v. Ridings*, 55 N.C. App. 630, 632-33, 286 S.E. 2d 614, 615, *disc. rev. denied*, 305 N.C. 586, 292 S.E. 2d 571 (1982); *Harris v. Harris*, 50 N.C. App. 305, 318-19, 274 S.E. 2d 489, 497, *appeal dismissed*, 302 N.C. 397, 279 S.E. 2d 351 (1981).

III

The wife contends that the 14 May property settlement agreement and the 26 May amended agreement should be set aside as "patently unfair" and a "constructive fraud." We disagree.

A. Judicial Review of Property Settlement Agreements

Parties to a marriage may, by written agreement, forego their statutory right to equitable distribution and decide between themselves how their marital estate will be divided following divorce. N.C. Gen. Stat. Sec. 50-20(d) (1987); *see also* N.C. Gen. Stat. Secs. 52-10, 52-10.1 (1984). Whether entered into before, during, or after marriage, "[t]hese agreements are favored in this state, as they serve the salutary purpose of enabling marital partners to come to a mutually acceptable settlement of their financial affairs." *Hagler v. Hagler*, 319 N.C. 287, 290, 354 S.E. 2d 228, 232 (1987). A valid property settlement agreement which waives rights to equitable distribution "will be honored by the courts and will be binding upon the parties." *Id.* To be valid, a property settlement agreement must be in writing, executed and acknowledged before a notary or other certifying officer, and "deemed *by the parties* to be equitable." Sec. 50-20(d) (emphasis added). Like other marital agreements, a property settlement agreement must also be entered into voluntarily, without fraud, duress, or coercion. *See generally McIntosh v. McIntosh*, 74 N.C. App. 554, 556, 328 S.E. 2d 600, 602 (1985). *See also Small v. Small*, 93 N.C. App. 614, 379 S.E. 2d 273 (1989) (comparing property settlement agreements with other marital contracts).

Because property settlement agreements are "viewed today like any other bargained-for exchange between parties who are presumably on equal footing," a court will make no independent determination regarding the "fairness" of the substantive terms of the agreement, so long as the circumstances of execution were fair and the terms are not plainly unconscionable. *See Knight v. Knight*, 76 N.C. App. 395, 398, 333 S.E. 2d 331, 333 (1985). *See also Lane v. Scarborough*, 284 N.C. 407, 409, 411, 200 S.E. 2d 622, 624 (1973) (marital contracts are governed "by the same rules which govern interpretation of contracts generally[,] . . . 'according to the intention of the parties at the time of executi[on, as shown by] the language [they] employed. . . .' " (citation omitted) ). *But see McIntosh*, 74 N.C. App. at 556, 328 S.E. 2d at 602 (separation agreements " 'must be in all respects fair, reasonable and just' "

to be valid) (quoting *Eubanks v. Eubanks*, 273 N.C. 189, 195, 159 S.E. 2d 562, 567 (1968) ). Of course, as with any contract, a property settlement agreement which is unconscionable or which was procured by fraud, duress, or undue influence will not be enforced by the courts, unless it is later ratified. *See Link*, 278 N.C. at 197, 179 S.E. 2d at 706; *Knight*, 76 N.C. App. at 398, 333 S.E. 2d at 333. However, absent a showing of such wrongdoing by a party to the agreement (or his agent), "we must assume that this arrangement was satisfactory to both spouses at the time it was entered into." *Hagler*, 319 N.C. at 293, 354 S.E. 2d at 234.

B. Patent Unfairness or Unconscionability

[2] Considering all of the facts and circumstances shown by the parties' evidence, we cannot say the agreements in this case were "unconscionable" or "patently unfair" as a matter of law. *See Garris v. Garris*, 92 N.C. App. 467, 472, 374 S.E. 2d 638, 641 (1988).

First, the forecast of the evidence demonstrates that the husband did not affirmatively misrepresent or conceal the extent of the marital estate. *See Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E. 2d 117, 119, *disc. rev. denied*, 317 N.C. 703, 347 S.E. 2d 41 (1986) (duty to disclose ends when parties become adversaries negotiating over terms of separation); *cf. Lee v. Lee*, 93 N.C. App. 584, 378 S.E. 2d 554 (1989) (husband's breach of *contractually-imposed* obligation to disclose assets permitted rescission of separation agreement). Indeed, on 7 May 1987, one week before she entered the first agreement, the wife attended depositions of the husband and three financial experts, during which the husband's business was valued by each of them at approximately $2,000,000. Following the depositions, Mr. Stubbs, one of her attorneys, told her that the husband "would probably offer around $100,000 to settle the matter . . . [a]lthough . . . *the case was worth much more than that figure*. . . ." (Emphasis added.) In June, when Mr. Kellum told the wife that her share of the marital estate might have been around $1,000,000, she told him "that she knew that she got 'screwed' but that she just wanted it all over with."

Second, the settlement terms, for the most part, were proposed by the wife. The 14 May agreement is not unconscionable simply because the terms she proposed—through her attorney—left her with less than she might have had if the case had proceeded to trial. Nor are the agreements invalid simply because the wife failed to read them and to obtain legal advice before signing. *Accord*

*Biesecker v. Biesecker*, 62 N.C. App. 282, 285, 302 S.E. 2d 826, 828-29 (1986). Here, the wife had ample opportunity in the ensuing twelve days before she signed the amended agreement to read the 14 May agreement and to talk to her lawyer about it. Moreover, she does not contend that she was denied an opportunity to read the 26 May agreement or to consult her attorney before signing it.

The wife has forecast no evidence from which we can conclude that the agreements were unconscionable. Instead, the evidence in the record plainly shows that she considered the agreements equitable when she entered into them. Not only did the 14 May agreement recite that each party considered the terms "fair, just and reasonable given the facts and circumstances of each party's situation and in consideration . . . of the interests of the parties . . . [and] the interests of their children," but, in addition, the wife wrote a letter to her lawyers regarding attorneys' fees on 22 May, stating in part that "[o]n May 14, 1987[,] an agreement was reached between Bob Hill and I [sic] *which both of us are pleased about.*" In our view, the wife knowingly chose to bring an end to the continuing aggravation and stress associated with the outstanding equitable distribution claim. We will not step in now to set the agreement aside simply because she later decided the bargain she struck was a bad one.

C.  Constructive Fraud

[3]   We summarily reject the wife's contention that the agreements were a constructive fraud. Here, the fiduciary obligation normally existing between parties to a marriage had long been extinguished. Not only were the parties divorced before the agreements were entered, but each had employed independent counsel to represent them in the equitable distribution action and the settlement negotiations, and through counsel, they hammered out the terms of the property settlement. *Accord Avriett v. Avriett*, 88 N.C. App. 506, 508, 363 S.E. 2d 875, 877, *aff'd*, 322 N.C. 468, 368 S.E. 2d 377 (1988). "Being *sui juris* [the wife] was free to so contract and nothing in the record suggests that she is not bound thereby." *Id.*

IV

The wife's final contention is that the husband breached the agreements by failing to provide medical insurance, and that this breach created genuine issues of material fact, thereby precluding summary judgment. The husband argues that he did not breach

the agreement since, in his view, the obligation to "ascertain" that the wife was insured required him to provide her with insurance only in the event she was no longer covered by her present husband's policy.

We decline to address this question since the wife's Reply to the husband's amended Answer raised only the fraud, duress, and undue influence defenses to the agreements, and did not raise the breach of contract defense. A contention not raised in the court below will not be addressed on appeal. *Hall v. Hall*, 35 N.C. App. 664, 665-66, 242 S.E. 2d 170, 172, *disc. rev. denied*, 295 N.C. 260, 245 S.E. 2d 777 (1978).

V

We hold that summary judgment was properly entered in favor of the husband in the wife's equitable distribution action.

Affirmed.

Judges PARKER and ORR concur.