RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
———————————

WHIRLPOOL CORPORATION,
       *Plaintiff-Appellant/Cross-Appellee*,

    *v.*

THE GRIGOLEIT COMPANY,
       *Defendant-Appellee/Cross-Appellant*.

Nos. 11-2348/2421

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:06-cv-195—Paul Lewis Maloney, Chief District Judge.

Argued: November 29, 2012

Decided and Filed: April 12, 2013

Before: MARTIN, SILER, and DONALD, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Matthew T. Nelson, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant/Cross-Appellee. John M. Lichtenberg, RHOADES MCKEE PC, Grand Rapids, Michigan, for Appellee/Cross-Appellant. **ON BRIEF:** Matthew T. Nelson, Jeanne F. Long, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant/Cross-Appellee. John M. Lichtenberg, Alexander F. Denton, RHOADES MCKEE PC, Grand Rapids, Michigan, for Appellee/Cross-Appellant.

———————————

**OPINION**

———————————

SILER, Circuit Judge. This case concerns a contract dispute between Plaintiff, Whirlpool Corporation ("Whirlpool"), and Defendant, The Grigoleit Company ("Grigoleit"). Grigoleit supplied knobs for Whirlpool's washing machines and dryers for several years, and it sought to increase prices and amend the parties' purchase contracts in late 2004. The parties reached an amended agreement in February 2005,

which Whirlpool terminated later that year.  When Grigoleit demanded final payment, Whirlpool sued, arguing the contract was unenforceable.  The district court upheld the contract but found some aspects of it unconscionable.  Whirlpool appeals the district court's holding that the contract is enforceable.  Grigoleit cross-appeals, challenging the district court's holding that two provisions are unconscionable and its determination of awardable damages.  We **AFFIRM IN PART, REVERSE IN PART**, and **REMAND** the case to the district court for further proceedings consistent with this opinion.

**I.**

Whirlpool manufactures home appliances and purchased from Grigoleit knobs for its products for many years.  The parties' dealings were manifested in numerous Blanket Purchase Orders, which established prices that would be charged if and when Whirlpool issued a "release" for parts.  Releases authorized Grigoleit to manufacture and ship specific parts and indicated how many additional parts Whirlpool anticipated needing over the next several weeks and months.

In 2003, Whirlpool announced the impending termination of all of the appliance programs for which Grigoleit made parts.  Grigoleit asked to participate in some of the replacement programs but Whirlpool declined the request.  Over the next year, the volume of work received by Grigoleit from Whirlpool decreased significantly.  Grigoleit continued to supply the same range of parts, in smaller volume, and continued manufacturing and shipping parts based upon daily releases, at prices set by Blanket Purchase Orders which had not been amended since the 1990s.

On November 4, 2004, Grigoleit requested price increases, minimum volume commitments, and changes in the manufacturing and shipping requirements from Whirlpool.  The next month produced little meaningful discussion, and on December 22, Grigoleit warned that should Whirlpool refuse to negotiate, Grigoleit would be forced to terminate their existing agreement and terminate all open Blanket Purchase Orders on January 31, 2005.  In response, Whirlpool asked that Grigoleit provide justification for the price increases.  The parties communicated over the next several weeks but were

unable to reach an agreement.  During negotiations, Grigoleit demanded that the new price terms, although not yet determined, apply retroactively to November, the time of Grigoleit's initial request for price increases.

The parties still had not reached an agreement by January 31, 2005 when the Blanket Purchase Orders ended.  At the beginning of February, Grigoleit shared its concern that it was suffering "extrinsic costs" as a result of the ongoing yet unfruitful negotiations.  Grigoleit notified Whirlpool that it would impose a $10,000 charge for every additional week beyond February 1 that the parties failed to reach an agreement.

The parties eventually executed an agreement at the end of February (the "Agreement") whereby Whirlpool agreed to purchase and Grigoleit agreed to supply a much smaller volume of parts at increased prices.  According to Whirlpool, it paid in excess of $1.3 million due to the increases above the price it was charged by alternative suppliers that eventually replaced Grigoleit.  The Agreement included a flat fee of $40,000 to account for the "extrinsic costs" introduced earlier by Grigoleit,  price increases, and an additional 8% surcharge on all parts covered under the Agreement in lieu of applying the new prices retroactively to November.  Paragraph 5 of the Agreement covered liabilities and damages and is a point of much contention between the parties.  It reads:

> Whirlpool is liable for all quantities of finished parts, components, and raw materials that are processed and/or procured by Grigoleit in meeting its obligations under previous and new blanket PO's.  Such quantities may exceed the amount required to cover actual quantities of finished parts shown on the Grigoleit order balance at a given time, e.g. minimum buys of raw materials, etc.  The total Whirlpool liability for quantities of materials in excess of Grigoleit order balance shall not exceed $100,000 and shall be limited to obligations supported by Grigoleit inventory or other records as follows:
>
> a. Finished parts shall be paid by Whirlpool at ATTACHMENT A price.
>
> b. In process components shall be paid by Whirlpool at Grigoleit stated percentage of completion of ATTACHMENT A price.
>
> c. Raw material, which includes purchased components, committed and on hand shall be paid by Whirlpool at Grigoleit laid-in invoice price plus

thirty percent.  Grigoleit shall ship any parts, components and raw materials covered under this paragraph as directed by Whirlpool.

Paragraph 6, also a point of contention, authorized Grigoleit to ship Whirlpool parts according to Whirlpool's weekly releases.  It stated that "in no event will Grigoleit be required to hold as finished goods inventory more than 90 days."

Business dealings between the parties proceeded under the Agreement until the fall of 2005, when Whirlpool contracted Grigoleit's remaining work to two other suppliers and stopped issuing releases to Grigoleit altogether.  Grigoleit notified Whirlpool of inventories of finished parts exceeding 90 days in possession based on Whirlpool's existing releases and shipped them to Whirlpool.  Grigoleit also computed Whirlpool's liability for parts still within Grigoleit's possession pursuant to Paragraph 5 of the Agreement and invoiced Whirlpool to this effect.

Whirlpool refused to tender payment and filed suit in Berrien Circuit Court, asserting that the Agreement was the product of economic duress.  Grigoleit moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  The district court granted Grigoleit's motion, holding that a claim of economic duress cannot be predicated upon a party's threat to do that which it is legally entitled to do and finding that Grigoleit had an indisputable right to terminate its purchase orders with Whirlpool.  Whirlpool was permitted to file an amended complaint.

In its amended complaint, Whirlpool asserted that Grigoleit's termination of the purchase orders constituted extortion and the Agreement had therefore been formed under economic duress and was unconscionable.  Grigoleit again moved for dismissal and the district court found that threatening to terminate the contract was a lawful exercise of Grigoleit's rights.  Since a claim of economic duress requires proof of illegal action, Whirlpool could not sustain its claim.  The district court also held that Whirlpool had stated a claim that the Agreement was unconscionable, and Whirlpool filed a second amended complaint which included a claim for damages on the theory of unconscionability.  Grigoleit counter-claimed for damages based upon Whirlpool's termination of the Agreement.  Whirlpool then moved for partial summary judgment,

asking the district court to construe the damages provision of the Agreement. Whirlpool contended that Grigoleit's damages must be capped at Whirlpool's volume commitment, plus $100,000, as provided in Paragraph 5 of the Agreement. The district court found that the Agreement did not support Whirlpool's interpretation of its obligations to pay for finished parts and that finished parts authorized for manufacture by Whirlpool were subject to distinct purchase obligations under the Agreement, not confined to the $100,000 cap of Paragraph 5.

The district court conducted a bench trial to determine whether the Agreement was unconscionable and held it to be partially enforceable. It held that under the Michigan Uniform Commercial Code, a commercial contract or one of its provisions may be deemed unconscionable only upon a showing of both substantive and procedural unconscionability. It found that the prices set under the Agreement were substantively unconscionable because they were not supported by any evidence and, to the contrary, evidence presented during the bench trial established that Grigoleit was already pocketing a profit on its sales to Whirlpool prior to renegotiating prices. Only two aspects of the price increases were found to also be procedurally unconscionable and thus unenforceable. The district court found that Grigoleit hastily introduced the $40,000 "extrinsic costs" charge and the additional 8% surcharge, which left Whirlpool without a meaningful opportunity to negotiate or refuse them. It concluded that these provisions were unconscionable and unenforceable.

Whirlpool appeals, arguing that the district court erred in holding that the Agreement was not unconscionable. Whirlpool also challenges the holding that illegal activity, as opposed to merely wrongful conduct, is required to assert economic duress. Grigoleit cross-appeals the district court's findings that the "extrinsic costs" fee and additional 8% increase are unconscionable.

## II.

Under Michigan law, unconscionability is a question of law left to the courts, *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 323 (6th Cir. 1998), and we review such holdings *de novo*. *See also Gianni Sport Ltd. v. Gantos, Inc.*, 391 N.W.2d 760, 761

(Mich. Ct. App. 1986). However, unconscionability is determined by analyzing the facts and circumstances present when a contract was made, and a court's findings in these regards are reviewed for clear error. *Andersons*, 166 F.3d at 323.

**A. Unconscionability.**

Whirlpool first argues that an agreement may be held unconscionable on the basis of substantive unconscionability alone. Unconscionability is governed by Section 440.2302 of the Michigan Compiled Laws, which states:

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

A court interpreting Michigan law must answer two questions when determining whether contracts are unconscionable: "(1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; and (2) Is the challenged term substantively reasonable?" *Allen v. Mich. Bell Tel.*, 171 N.W.2d 689, 692 (Mich. Ct. App. 1969). These inquiries speak to procedural unconscionability and substantive unconscionability, respectively. *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 474 (Mich. Ct. App. 2005) (citing *Nw. Acceptance Corp. v. Almont Gravel, Inc.*, 412 N.W.2d 719, 723 (Mich. Ct. App. 1987)).

Whirlpool argues that unconscionability is determined on a sliding scale and that a substantial degree of substantive unconscionability is alone sufficient to render an agreement unenforceable, even absent a finding of procedural unconscionability. Grigoleit responds that under well-settled Michigan law, both substantive and procedural components must be established before an agreement will be held unconscionable.

Many courts employ a balancing approach to the question of unconscionability, "and to tip the scales in favor of unconscionability, most courts seem to require a certain quantum of procedural *plus* a certain quantum of substantive unconscionability."

*Citizens Ins. Co. of Am. v. Proctor & Schwartz, Inc.*, 802 F. Supp. 133, 144 (W.D. Mich. 1992) (overruled on other grounds) (emphasis added) (internal quotation marks omitted). The Michigan Court of Appeals in *Allen v. Michigan Bell* recognized that unconscionability requires "an absence of meaningful choice on the part of one of the parties *together with* contract terms which are unreasonable [sic] favorable to the other party." 171 N.W.2d at 692 (emphasis added). Therefore, "merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced." *Id.* Likewise, "if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties." *Id.* Accordingly, federal courts  consistently observe that Michigan law requires a party to demonstrate both procedural and substantive unconscionability. *See Pichey v. Ameritech Interactive Media Servs., Inc.*, 421 F. Supp. 2d 1038, 1044-45 (W.D. Mich. 2006)*; Citizens Ins.*, 802 F. Supp. at 144 ("[A] determination of unconscionability cannot be made with respect to the subject provision based on its 'substantive' content alone, but must be premised upon the 'procedural' factors.").

In defense of its position that substantive unconscionability alone is sufficient to deem an agreement unconscionable, Whirlpool cites to numerous courts from other states that have endorsed this view. However, none of these cases comes from Michigan or implicates Michigan law. Also, as Grigoleit correctly notes, most of these cases do not arise under the Uniform Commercial Code, nor from contracts between commercial parties. Because Michigan law is consistent and clear, the district court properly held that both substantive and procedural unconscionability are required to hold an agreement unenforceable.

### 1. Substantive unconscionability.

We need not determine whether the district court properly concluded that the Agreement's price terms are substantively unconscionable because we uphold the district court's finding of no procedural unconscionability on all terms except for the

$40,000 fee and the 8% surcharge, and we find the district court erred in finding those two charges to be procedurally unconscionable.  The question of substantive unconscionability is irrelevant.

## 2. Procedural unconscionability.

Procedural unconscionability is determined by evaluating the bargaining power of the parties, their relative economic strength, and their alternative sources of supply. *Gianni Sport*, 391 N.W.2d at 761-62.  "[T]he most important factors in determining procedural unconscionability are (1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable." *Andersons*, 166 F.3d at 324.  Although courts should not substitute their judgment for that of freely contracting parties, "[i]mplicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered." *Nw. Acceptance Corp.*, 412 N.W.2d at 723 (internal quotation marks omitted).  As the Michigan Court of Appeals explained in *Northwest Acceptance Corp.*,

> Where goods and services can only be obtained from one source (or general sources on noncompetitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without.  Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative.  Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the court's enforcing it on the ground that it was "freely" entered into, when it was not.  He cannot in the name of freedom of contract be heard to insist on enforcement of an unreasonable contract term against one who on any fair appraisal was not free to accept or reject that term.

*Id*. at 723–24 (internal quotation marks omitted).

We must determine whether the district court clearly erred in determining that the $40,000 flat fee and 8% surcharge are procedurally unconscionable.  First and foremost in this discussion is our consideration that Whirlpool is a large, sophisticated corporation, presumably capable of competent negotiation.  "[U]nconscionability is

rarely found in a commercial context . . . ." *Pichey*, 421 F. Supp. 2d at 1045 (citations omitted). In fact, agreements involving commercial parties on both ends have only been found unconscionable in context of extreme, blatant, unavoidable inequities, such as those where damages are limited even where a contract is wholly unperformed, *See Allen*, 171 N.W.2d at 693, and those where parties are given no opportunity to review or read an agreement before signing it, *see Nw. Acceptance Corp.*, 412 N.W.2d at 721, 724. No such extreme circumstances are present here. As the district court observed, Whirlpool failed to negotiate in good faith with Grigoleit until February 2005. In fact, Whirlpool rebuffed and even ignored Grigoleit's efforts to discuss modifying the parties' contract until that time. The $40,000 flat fee and 8% increase, although agreed upon in the eleventh hour, were not the result of strong-arming or foul play. Both fees essentially represent payment for the delay in reaching an agreement, and that delay could have been avoided entirely by Whirlpool. Because Whirlpool created its own unfavorable circumstances, we cannot conclude that the terms it agreed to under such circumstances were non-negotiable.

Moreover, Whirlpool proposed the $40,000 flat fee and 8% increase. It did so to avoid paying even higher amounts in fees for the delay it caused by failing to negotiate in good faith earlier. It is plainly illogical to deem terms unconscionable where they were proposed by the complaining party itself and no allegations of fraud or duress are presented. *See Roussalis v. Wyoming Med. Ctr., Inc.*, 4 P.3d 209, 246 (Wyo. 2000) ("[W]e find it difficult to accept the notion that a party who proposes an allegedly unconscionable term can be viewed as an innocent party who is oppressed or unfairly surprised by a provision of its own making."); *Hill v. Hill*, 380 S.E.2d 540, 546 (N.C. Ct. App. 1989). Because Whirlpool proposed the $40,000 flat fee and 8% increase in lieu of higher payments to Grigoleit for delays that Whirlpool itself caused, there is no unfair oppression or absence of bargaining power in the parties reaching these terms.

Whirlpool's strongest argument in support of finding procedural unconscionability is that, because Grigoleit was the sole source of parts for a particular line of washing machines and dryers, Whirlpool was left without an alternative source

from which to procure parts. Although it is true that Grigoleit was Whirlpool's sole supplier of knobs, this arrangement was by Whirlpool's own design. As a Whirlpool representative testified at trial, sole-source arrangements allow Whirlpool to avoid a number of manufacturing and design costs. For this benefit, Whirlpool mindfully elects to enter into such arrangements with its suppliers. In exchange however, Whirlpool inherently accepts the risk that a disagreement with one of its suppliers may cause a manufacturing delay. Therefore, Whirlpool's inability to order the specific parts in question from another supplier does not conclusively render the terms it agreed to unconscionable. Furthermore, Whirlpool in fact did have other suppliers from which it could purchase parts, as evidenced by its ability to replace Grigoleit as a supplier within a few short months of seeking out alternatives.

Although the $40,000 flat fee and 8% increase may be unfavorable to Whirlpool, the district court unmistakably erred in finding these terms procedurally unconscionable. Whirlpool created the urgent and unfavorable conditions under which it proposed these terms, and it had ample time and opportunity to negotiate more favorable terms. More importantly, Whirlpool had the resources, experience, and ability to avoid these terms entirely, yet chose not to do so.

### 3. Whether the agreement, partially or in its entirety, is unconscionable.

As discussed above, both procedural and substantive unconscionability are required in order to hold a provision or an entire agreement unconscionable. Having found that the "extrinsic costs" charge and 8% surcharge are not procedurally unconscionable, it follows that they cannot be held unenforceable. Moreover, because these terms are not unconscionable, Whirlpool's argument in favor of holding the entire agreement unenforceable fails. Absent a finding of procedural unconscionability, there are no grounds upon which we should consider whether the entire agreement is unenforceable.

**4. Certification of unconscionability question to the Michigan Supreme Court.**

In the alternative to concluding that the Agreement is unconscionable, Whirlpool asks us to certify to the Michigan Supreme Court the issue of whether substantive unconscionability alone, particularly as to an excessive price term, is sufficient to deem an agreement unconscionable.

Pursuant to Michigan Court Rule 7.305(B), when "consider[ing] a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Michigan Supreme Court."

Whether substantive unconscionability may alone invalidate an agreement is not an issue of first impression or unsettled Michigan law. As explained, Michigan law requires a party asserting unconscionability to prove both procedural and substantive unconscionability. *See Pichey*, 421 F. Supp. 2d at 1044-45; *Citizens Ins.*, 802 F. Supp. at 144; *Allen v. Michigan Bell*, 171 N.W.2d at 692. Therefore, we will not certify this issue to the Michigan Supreme Court.

**B. Economic duress.**

Whirlpool also requests that we certify a question to the Michigan Supreme Court regarding its claim of economic duress. In its complaint and first amended complaint, Whirlpool asserted that the Agreement was a product of economic duress. Whirlpool argued it only entered into the Agreement because Grigoleit threatened to interrupt Whirlpool's manufacturing operations by terminating Blanket Purchase Orders as of January 31, 2005. The district court granted Grigoleit's motion to dismiss this claim on the basis that, under Michigan law, one seeking to avoid a contract claimed to be the product of duress must plead illegal compulsion. Because Whirlpool failed to plead "anything even remotely illegal or unlawful," it failed to state an economic duress claim.

On appeal, Whirlpool argues that although Michigan law currently requires illegal action as an element of a claim for economic duress, a more recent dissent in the Michigan Supreme Court suggests that the issue is unsettled.  As early as 1881, the Michigan Supreme Court held that illegal action is a necessary element of economic duress.  *Hackley v. Headley*, 8 N.W. 511, 512-13 (Mich. 1881) ("Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.").  Since *Hackley*, Michigan courts have repeatedly and consistently required illegal action to prove economic duress.  *See e.g., Quartell v. Great Lakes Bancorp*, No. 183368, 1996 WL 33347624, at *2 (Mich. Ct. App. 1996); *Enzymes of Am., Inc. v. Deloitte, Haskins & Sells*, 523 N.W.2d 810, 814 (Mich. Ct. App. 1994), *rev'd on other grounds*, 539 N.W.2d 513 (Mich. 1995);  *Apfelblat v. Nat'l Bank Wyandotte-Taylor*, 404 N.W.2d 725, 728 (Mich. Ct. App. 1987) ("Duress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune.  Fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully.").  More recently, in *Stefanac v. Cranbrook Educ. Cmty.*, Justice Levin, dissenting, noted that Michigan law on economic duress "may have lagged behind" other states which no longer require illegal action.  458 N.W.2d 56, 74 n. 40 (Mich 1990) (Levin, J., dissenting).  Although it is true that Michigan law may be different than that of other states, Justice Levin's remark on this issue does not suggest that it is unsettled, as argued by Whirlpool.  To the contrary, Justice Levin continues in his dissent to note that "fairly recent Michigan cases" continue to cite and apply *Hackley*'s requirement of illegal action.  *Id.*  For this reason, we decline to certify Whirlpool's economic duress question to the Michigan Supreme Court.

## C. Damages limitation pursuant to the Agreement.

Whirlpool's final argument on appeal concerns the district court's interpretation of damages pursuant to Paragraph 5 of the Agreement.  Specifically, Whirlpool argued in its brief that Paragraph 5 limits Whirlpool's liability to $100,000.  However,

Whirlpool withdrew its position at oral argument and no longer challenges the district court's ruling.  For this reason, we decline to review this issue on appeal.

## III.

We **AFFIRM** the district court's ruling that the Agreement is enforceable. However, we **REVERSE** the district court's holding that the $40,000 flat fee and 8% increase are unconscionable and direct entry of a judgment in favor of Grigoleit on its cross-appeal.